Filed 8/22/14  In re S.J. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.J., a Person Coming Under the Juvenile Court Law. | B253138 (Los Angeles County Super. Ct. No. CK88101) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. B.A., Defendant and Appellant. | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on July 25, 2014, be modified as follows:

1.     On page 12, the second paragraph, first full sentence, the words "In an excessively lengthy opening brief," and footnote 4 appended thereto, are deleted, which will require renumbering of all subsequent footnotes.  The capitalized word "Mother," replacing the lower-case word "mother," now begins the sentence.

2.	On page 21, first full paragraph, seventh sentence, the words "federally registered," are deleted, and the words "listed in the federal registry" are inserted in their place.

3.	On page 23, the second full paragraph, first sentence, the parenthetical phrase "(also not a federally recognized tribe)" is deleted.

There is no change in the judgment.

_____
ROTHSCHILD, P. J.	CHANEY, J.	JOHNSON, J.

Filed 7/25/14  In re S.J. CA2/1 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.J., a Person Coming Under the Juvenile Court Law. | B253138 (Los Angeles County Super. Ct. No. CK88101) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> B.A., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Amy M. Pellman, Judge, and Stephen Marpet, Juvenile Court Referee.  Reversed with directions.

Joanne D. Willis Newton, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

A mother appeals following an order terminating parental rights. She argues orders made by the juvenile court at the combined 12- and 18-month review hearing, and all subsequent orders, must be reversed because the court committed prejudicial violations of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA). We agree.

## PROCEDURAL AND FACTUAL BACKGROUND

*Initial petition*

S.J., the medically fragile child who is the subject of this action, was born prematurely at 24 weeks on November 2010, remained in the hospital until February 2011 and continued receiving care through a premature infant clinic. On May 26, 2011, appellant B.A. (mother) left six-month-old S.J. in the care of the child's father J.J. (father, who is not a party to this appeal), while she attended an evening Bible study. Mother (then 18 years old), and S.J. lived in an apartment with S.J.'s maternal grandfather (grandfather), who was away at work. Father, himself a 17-year-old dependent of the juvenile court, stayed with mother and S.J. at grandfather's home several days each week. S.J. had no bruises or injuries when mother left. When mother returned home, S.J. was asleep on father's chest, but her face was bruised and a tissue with blood on it was lying nearby. Father told mother that S.J. fell off the bed as he tried to staunch her nosebleed. Late the next day mother took S.J. to the hospital because of her incessant crying and difficulty feeding. When she arrived at the hospital, the baby had bruises on both sides of her mouth, a scratch on her upper lip, and dried blood on her nose. The doctors suspected the injuries were the result of physical abuse.

Father was interviewed and claimed S.J. sustained injuries during three separate incidents on the same day while in his care: she bumped her face on the sink faucet as he bathed her in the morning, scratched her lip around noon when he angrily forced a bottle into her mouth during an argument with mother, and hit her face on the side of her crib when she fell from the bed to the floor later that evening. Father also said he had given S.J. a swollen lip about a month earlier when he angrily and forcefully shoved a bottle into her mouth in front of mother, and admitted S.J.'s cheek had been bruised about two weeks earlier after she rolled off the bed while in his care. Father acknowledged that he had a problem with anger management, and sometimes hit the wall or threw things.

2

When interviewed, mother said she did not believe father had physically abused S.J., and said she would continue to leave father alone with the infant. Mother also denied abusing S.J. herself, but acknowledged that the baby had fallen off the bed in February or March. S.J. had cried for a few minutes then stopped, so mother did not seek medical attention. Grandfather reported that he had noticed the baby was injured when he returned home from work on May 26, but did not know what happened. He had never seen the parents acting aggressively toward S.J., but he knew the baby was hurt and found the circumstances of her injury suspicious. He urged mother to take her to the hospital, threatening to call authorities if she refused.

On May 28, 2011, respondent Department of Children and Family Services (DCFS) detained S.J. in a foster home. At mother's request, S.J. was subsequently moved to the licensed foster home of family friends and paramedics, T.M. and S.M. (foster parents), where she remains. On June 2, 2011, DCFS filed a petition under Welfare and Institutions Code section 300,[1] subdivisions (a) and (b), alleging S.J. had suffered injuries consistent with non-accidental trauma, that mother knew about father's physical abuse and failed to protect S.J., that the parents failed to obtain timely medical attention for the infant's injuries and failed to provide appropriate supervision resulting in multiple falls off the bed. At the detention hearing, DCFS was ordered to provide reunification services for the parents, who also received supervised visits at least twice each week.

At the time of the baby's detention, mother informed DCFS and the juvenile court that she was a member of Sweetgrass First Nation, a Canadian Indian tribe, and had lived on the tribe's reservation until she was 16 years old. Mother believed the tribe had sister tribes in Montana, and insisted that, in accordance with the 1798 Jay Treaty,[2] she should be

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] We presume mother meant to refer to the "Treaty of Amity, Commerce, and Navigation," between the United States of America and Great Britain, November 19, 1794, commonly known as the "Jay Treaty" which, among other things, "extended and

3

recognized as a Canadian-born Native American. Mother also filed a Parental Notification of Indian Status form (ICWA-020), identifying her ancestry in the Sweetgrass First Nation and her registration number. At the detention hearing, the court indicated that the ICWA applied only to American Indians, but ordered DCFS to investigate further. In July, Grandfather also told DCFS and police officers who had investigated the May 26 incident that he was "a Canadian born Indian from the Cree Tribe," and was concerned about mother and S.J. being denied their ICWA rights under the Jay Treaty, and provided them a copy of the treaty. When asked about this issue by the police, DCFS said the court had concluded the ICWA did not apply, and that the abuse had occurred off-reservation. DCFS had concluded S.J. lacked Native American heritage, but said it was still researching the issue because of mother's status as a Canadian-born Indian. The court found the ICWA did not apply since the Canadian tribe was not listed in the Federal Registry and until after June 2013 handled the matter as a non-Indian case.

*First amended petition*

On July 27, 2011, DCFS filed the operative first amended petition adding new allegations under section 300, subdivisions (a), (b) and (e). Additional investigation had revealed the parents had delayed before seeking medical attention for S.J., the child's facial injuries appeared as though someone had grabbed and squeezed her face, and her facial bruising, bloody nose and cut lip were indicative of physical abuse. In addition, X-rays taken on May 28 revealed S.J. had healing leg and rib fractures and an unspecified wrist injury.

*Jurisdictional hearing*

The jurisdictional hearing was held on July 7, 2011. In the interim, DCFS reported that mother had been offered and had refused Regional Center Services for S.J. in March and

---

acknowledged various rights of Amerind tribal groups occupying areas on or near the U.S.-Canadian border," and retained for "Indians on either side of the border . . . the right to move freely back and forth across the border, the so-called 'free passage' right." (Nickels, *Native American Free Passage Rights Under the 1794 Jay Treaty: Survival Under United States Statutory Law and Canadian Common Law* (2001) 24 B.C. Int'l & Comp. L. Rev. 313, internal fns. omitted.)

May 2011.  The social worker was concerned that the mother had declined to ensure S.J.'s early participation in Regional Center Services, and recommended that a Evidence Code section 730 evaluation (730 evaluation) be conducted to assess mother's needs and provide additional recommendations for her case plan.  Mother appeared to be somewhat developmentally delayed, but no details were known.  Father conceded that he had problems with anger management.  The foster mother monitored parental visits.  She reported that, although the parents were never rough with S.J., they ignored advice on how to properly handle the medically fragile baby given her prematurity and injuries, continually neglected to help S.J. with her developmental exercises despite repeated reminders, and failed to pick up on the child's cues.  Meanwhile, S.J. had done well in her foster parents' care, and her weight had increased from the 5th to the 60th percentile.

On October 6, 2011, the court sustained an amended petition.  It found that S.J. had suffered bruising to her cheeks, a bleeding laceration on her nose, a scratched upper lip, and healing rib and leg fractures, injuries consistent with non-accidental trauma and which would not have occurred but for the deliberate, unreasonable and neglectful acts of her parents.  The court found further that father had forced a bottle into the infant's mouth causing facial injuries, and she had fallen on multiple occasions, hitting her face on a crib and a faucet, injuries for which the parents failed to seek medical attention.  S.J. was declared a dependent under section 300, subdivisions (a), (b), and (e), removed from parental custody and suitably placed.  DCFS was ordered to provide the parents with reunification services.

*Reunification Period*

Both parents participated in parent education and counseling to address attachment issues pertaining to S.J..  Father did not participate in anger management despite being ordered to do so.  S.J., a medically fragile child with many special needs, attended numerous medical and therapeutic (physical, developmental and psychological) appointments every week.  The parents were encouraged to attend those appointments, but their participation throughout this proceeding was sporadic.  One medical provider told DCFS mother seemed to lack an understanding of the details of S.J.'s injuries.  S.J.'s physical therapist, who had over 20 years of experience, opined that the baby did not seem to trust mother, and the two

5

had no connection. S.J. was more relaxed with father, but her real connection was with her foster parents. S.J.'s developmental therapist observed that the baby had made "tremendous progress" in her foster parents' care. The foster mother kept a detailed log of S.J.'s progress, and the parents' participation in her care and visits. Among other things, she noted that the parents failed to read the baby's cues, overfed her, refused to listen to the advice of the foster mother or therapists, failed to educate themselves about S.J.'s unique medical needs and appeared unable to tend to her medical issues, including the child's frequent episodes of difficulty breathing, due to her asthma and Reactive Airway Disease.

Per court order, Michael P. Ward, Ph.D. performed a 730 evaluation of the family in January 2012 to address the likelihood S.J. would be physically or emotionally abused by a parent or member of the household, the relationship between the parents and child, and the parents' ability to care for S.J.'s safety. Dr. Ward concluded that father, in particular, had unaddressed anger issues and posed a threat to the child. In Dr. Ward's opinion, grandfather appeared to be a stable and good resource for S.J. However, grandfather worked two jobs, seven days per week and was rarely home. His schedule placed considerable constraints on his ability to monitor the parents' contact with the child. Dr. Ward concluded: "Assuming the parents are still living together in the home of [grandfather], who is basically not there much because of his work, and given the sustained petition, the remaining concerns about the parents, and the fact that the father, about whom there are frankly more serious concerns than the mother, has not really been in parenting much and has not even started counseling, for whatever reasons, this child obviously cannot be placed with her parents at this point in time, or for that fact, any time in the near future." He also noted that the foster parents had taken very good care of S.J., although he expressed concern about the foster mother's extensive documentation and charting of the parents' behavior.

During a visit in February 2012, S.J. bit mother, who took the child by her upper arms and shook her. Both parents were arrested and incarcerated in April 2012 (seemingly for the initial abuse perpetrated against S.J.), Both were convicted, and the criminal court ordered them to have no contact with S.J. pending further action in the juvenile court.

6

Meanwhile, S.J. continued to make progress in the care of her foster parents. A hole in her heart was beginning to close (making surgery unnecessary), her broken bones had healed and her vision had stabilized. But her asthma was worse and at 19 months old, she was not yet walking. She continued to see numerous doctors, as many as six specialists and had physical, developmental and attachment therapy three times each week. She was generally a happy child, but experienced night terrors.

In late June 2012, the juvenile court permitted the parents to resume monitored visitation. Parental visits did not resume until August due to venue changes, extensive scheduling difficulties and DCFS's need to find a new monitor after the foster parents refused to continue to monitor parental visits.

In its report for the 12-month review hearing in early August 2012, DCFS observed that S.J. was still thriving. She had grown to an age-appropriate size, had become more mobile and was responding positively to her therapies. The parents remained sporadically involved in S.J.'s treatment sessions. Mother had completed 18 sessions of a 26-week parenting class, and was participating in individual counseling. She attended two joint child-parent psychotherapy sessions with S.J.[3] DCFS observed that mother was involved in the reunification plan and had made progress. She had not, however, made sufficient progress to justify a resumption of custody. S.J. continued to experience an adverse response to mother, and had a difficult time when parental visitation resumed. DCFS also remained concerned about mother's ability to handle the toddler's asthma attacks, and to meet her many medical and psychological needs. DCFS recommended that the court terminate reunification services and set the matter for a section 366.26 hearing. The court set the matter for a contested hearing, and ordered DCFS to assess grandfather as a possible placement option.

In December 2012, DCFS reported that S.J. had attended seven medical appointments since the previous court hearing in October 2012. The parents had not attended parenting classes since August 2012, and had not completed that course. In addition, during a visit in

---

[3] Joint sessions were suspended in April 2012 due to the criminal action.

7

October 2012 when S.J. needed her asthma medication, mother had tried to give it to her, but did not know how to use the nebulizer correctly and spilled the medicine. The foster mother brought more medication and showed mother how to administer it. The next day, the parents, foster parents, monitors and grandfather met with S.J.'s asthma specialist for training on how to administer the medicine.

DCFS observed that S.J. remained a "very medically fragile two-year old" who required near-daily medical and therapeutic services. The social worker noted that both the foster and biological parents had S.J.'s best interests at heart, and that mother had developed more maturity over the course of the dependency proceeding. But the parents' missed therapy sessions remained a matter of concern. In addition, the parents still lived together in grandfather's home. Grandfather worked a great deal. If S.J. were placed in his home, the parents would be alone with her all day, and father would be the sole caretaker when mother was at work. Given Dr. Ward's concerns, DCFS opined that placement with grandfather remained untenable.

*The ICWA is found inapplicable*

On December 11, 2012, mother submitted a letter dated December 7, 2012 from the Blackfeet Tribe, entitled "Descendant Form." It indicated that S.J.'s maternal great-great grandfather was a member of the tribe. Mother, although not an enrolled member, was one sixteenth degree Blackfeet; S.J. was one thirty-second degree Blackfeet. In letters submitted on December 11, 2012, mother sought to invalidate the dependency action on the ground that S.J. was an Indian child within the meaning of the ICWA and the tribe had never been notified, and informed the court she had designated grandfather as S.J.'s Indian custodian in accordance with tribal custom and the ICWA. Mother also filed Notice of Child Custody proceeding for an Indian Child forms (ICWA-030), completed by herself and grandfather indicating that S.J., mother and grandfather were members of the Blackfeet Nation of Montana, and containing their membership or enrollment numbers. The forms also said S.J. might be a member of the Turtle Island Chippewa Indians. The notices contained identifying information for father, mother, grandfather, the maternal grandmother and maternal great-grandparents, and listed grandfather as S.J.'s Indian custodian. After reviewing the forms,

8

the juvenile court observed that mother and grandfather were not members of the Blackfeet tribe, as stated on the forms, only tribal descendants. It observed that the letter from the Blackfeet tribe was a "descendant form" indicating only that S.J.'s great-great grandfather was a registered member. Over objections by counsel for mother and father, the court found it was premature to conclude that the ICWA governed this action, as neither mother nor child were enrolled members, and denied requests to continue the hearing to ensure proper ICWA notice was effected. DCFS was ordered to notify the Blackfeet tribe, but the court proceeded to trial on the issue of whether to terminate reunification services.

Mother requested that the court return S.J. to her custody, noting that she still lived with grandfather, a circumstance she argued would provide sufficient protection for S.J. Mother also informed the court that she had enrolled in an additional year-long parenting program as required by the criminal court. At the conclusion of the hearing, the court observed that despite over 18 months of services, the parents had still only partially complied with their case plan. Reunification services were terminated, and the matter was set for a section 366.26 hearing. The parents were served by mail with notice of their right to file a writ.

*The section 366.26 hearing and application of the ICWA*

The section 366.26 hearing began on April 9, 2013. DCFS reported that S.J. had continued to make progress notwithstanding her many impairments and delays. Her foster parents wanted to adopt her and were willing to maintain S.J.'s relationship with her biological family. Their home study had been approved.

DCFS had sent notice of the April 2013 section 366.26 hearing to the Blackfeet Agency, Bureau of Indian Affairs; the Blackfeet Agency, Rocky Mountain Region; the Bureau of Indian Affairs (BIA); and the Secretary of the Interior. By a letter dated April 8, 2013, from the Osage Nation, the Osage tribe stated that S.J. was eligible and had applied for membership, and that she was thirty-second degree Osage, through her maternal great-great-great grandfather. Mother and grandfather had become members of the Osage Nation. Mother indicated in a note dated April 9, 2013, that she had transferred S.J.'s physical custody to grandfather as the child's Indian custodian. The court, however, found good

9

cause not to alter S.J.'s placement on account of her special needs, and ordered that she remain with her foster parents. The matter was continued to permit DCFS to contact the Osage Nation and follow up on notice to the Blackfeet tribe. In April 2013, the Osage Nation, a federally recognized tribe, notified DCFS that S.J. was eligible and had applied for membership in the tribe. In June 2013, the court found the matter was governed by the ICWA and transferred the case to the court designated to handle ICWA matters. The ICWA court continued the matter and ordered DCFS to provide the Osage Nation with a copy of the legal file, provide notice of the continued hearing and to facilitate S.J.'s participation in a "pipe" ceremony with grandfather.

On July 30, 2013, the juvenile court granted a motion by the Osage Nation to intervene. At a hearing on that date, attended telephonically by Leah Big Horse, the Indian Child Welfare Specialist of the Osage Nation, and Cliff Patterson, the Assistant Attorney General with the Osage tribe, father argued that DCFS had failed to comply with ICWA notice requirements. After Big Horse and Patterson indicated that S.J. was an enrolled member, the court asked father's counsel if there was another tribe to which the child was more connected, to which his attorney responded, "No." At that, the court replied, "Okay. Then we are good . . . [t]he child has the tribe that she is enrolled in."

On order of the court, DCFS looked into letting S.J. participate in the pipe ceremony as requested by grandfather, although the social worker and tribe were concerned about how the smoke from the ceremony—which the tribe had discontinued more than 125 years before—would affect the child's asthma. Meanwhile, the parents had stepped up their efforts to participate in S.J.'s therapy sessions, mother was participating in a new parenting program which the criminal court had ordered her to attend, and both parents had completed CPR and First Aid requirements. S.J. continued to exhibit considerable distress before and after parental visits.

DCFS forwarded case information to the Osage Nation tribe, which initially disagreed with S.J.'s non-Indian placement with her foster parents. DCFS and the tribe tried unsuccessfully to locate an ICWA-compliant home able to accommodate S.J.'s special needs. Like DCFS, the tribe did not believe grandfather should assume care of the child, in

10

light of the fact that she had been living in his home when she sustained serious injuries. DCFS asked grandfather for names of family members or friends who could offer a home for S.J., but he was unable to identify anyone in the United States. In the end, the Osage Nation expressed its preference that S.J. be adopted by her foster (and by then de facto) parents, who were well able to meet her special medical and other needs.

Monitored parental visits continued three times per week and generally went well; mother, in particular, was very attentive to S.J. Neither parent, however, was able to identify when the child was ill or needed medical treatment, and each still required prompting in that regard. The parents also appeared unable to handle S.J.'s tantrums, and did nothing to stop her from hurting herself when they occurred.

The section 366.26 hearing was completed on October 7, 2013. Mother requested a continuance, stating she had disenrolled S.J. from the Osage tribe, and planned to enroll the child in the "Rocky Boy Chippawalk Creek Nation in Montana" [sic]. The court proceeded to trial after the tribal representative for the Osage Nation informed the court that mother, who did not have current custody of the child, lacked authority to relinquish S.J.'s tribal membership. The court received various DCFS reports into evidence (over mother's objection), took judicial notice of the sustained petition and minute orders and heard testimony from Big Horse.

Big Horse, the Child Protection Specialist and a part-time social worker for the Osage Nation, has been employed by the Osage agency since 2005. She reviewed DCFS reports, the sustained petition and Dr. Ward's 730 evaluation. She did not interview the parents, but did communicate with grandfather and the foster parents after they contacted the tribe. She testified that her opinion that S.J. could not safely be returned to the parents' care was based on information provided by DCFS, specifically information regarding the child's fractures, medical needs, the parents' sporadic participation in visitation and treatment sessions, and the parents failure to complete parenting courses. Big Horse testified that the tribe had searched unsuccessfully for an ICWA compliant foster home, but none was available that could meet S.J.'s special needs. Thus, there was good cause for S.J. to remain placed with her foster parents, even though the home was not ICWA-compliant.

11

At the conclusion of the hearing, the court found, "beyond a reasonable doubt, including live testimony by a qualified ICWA expert, that continued custody of the child by the parents is likely result in serious emotional or physical damage to the child." The court also found, by clear and convincing evidence, that DCFS had made active efforts to provide remedial services and rehabilitation programs designed to prevent the breakup of the Indian family, but those efforts had been unsuccessful. Parental rights were terminated. The court found that DCFS incorporated culturally appropriate services into the case plan, and good cause existed to depart from the statutory placement preferences due to S.J.'s extraordinary physical and emotional needs. Mother appeals.

## DISCUSSION

In an excessively lengthy opening brief,[4] mother maintains the juvenile court's December 11, 2012 orders terminating reunification services and setting the matter for a selection and implementation (section 366.26) hearing, and all subsequent orders, must be reversed because the court committed multiple prejudicial violations of the ICWA. DCFS contends that mother has forgone the opportunity to complain about the events that transpired at the combined 12- and 18-month review hearings (sections 366.21 and 366.22, respectively), by failing to seek timely writ review. DCFS further asserts that, apart from some notice errors which can be cured by limited remand, no error occurred.

1.     *Good cause exists to excuse mother's failure to seek writ review*

The combined section 366.21 and section 366.22 hearings concluded on December 11, 2012, at which point the court found the parents had only partially complied

---

[4] Without demonstrating good cause or obtaining leave from the Presiding Justice to do so, mother submitted an opening brief that exceeds the 14,000 maximum word limit by 11,288 words. (Cal. Rules of Court, rule 8.204(c)(1), (5).) (Further rules references are to the California Rules of Court.) Ordinarily, we would consider striking such a noncompliant brief. (Rule 8.204(e)(2)(B).) Because time is of the essence in this appeal from an order terminating parental rights, and because complicated issues of federal and state law are involved, we exercise our discretion to consider the brief. We caution counsel to adhere to rule 8.204 in the future.

with their case plan and that S.J. could not safely be returned to their custody. The court ordered reunification services terminated and scheduled a section 366.26 hearing. Mother argues that those findings and orders must be set aside because the court committed multiple violations of the ICWA. In response, DCFS maintains that mother cannot challenge the orders terminating reunification services and setting the matter for a section 366.26 hearing on appeal, having failed timely to file a petition seeking extraordinary review. (§ 366.26, subd. (l)(3)(A).)

Section 366.26, subdivision (l) requires the court, after terminating reunification efforts and issuing an order setting a section 366.26 hearing, to "advise all parties of the requirement of filing a petition for extraordinary writ review as set forth in this subdivision in order to preserve any right to appeal in these issues." (§ 366.26, subd. (l )(3)(A).) Notice must be "made orally to a party if the party is present at the time of the making of the order or by first-class mail by the clerk of the court to the last known address of a party not present at the time of the making of the order." (*Ibid*; see rule 5.590 (b)[5].)

In our recent opinion in *Maggie S. v. Superior Court* (2013) 220 Cal.App.4th 662 (*Maggie S.*), we rejected the forfeiture argument advanced here by DCFS. In *Maggie S.* we affirmed the rule that a court's failure to issue an oral advisement of the writ requirement at a referral hearing at which a parent is present will not necessarily preclude review of orders made at that hearing on appeal from an order terminating parental rights. In *Maggie S.*, the mother, present at the hearing at which the juvenile court denied reunification services and

[5] Rule 5.590(b) provides, "When the court orders a hearing under . . . section 366.26, the court must advise all parties and, if present, the child's parent, guardian, or adult relative, that if the party wishes to preserve any right to review on appeal of the order setting the hearing under . . . section 366.26, the party is required to seek an extraordinary writ by filing a Notice of Intent to File Writ Petition and Request for Record . . . (form JV–820) or other notice of intent to file a writ petition and request for record and a Petition for Extraordinary Writ . . . (form JV–835) or other petition for extraordinary writ. [¶] (1) the advisement must be given orally to those present when the court orders the hearing under . . . section 366.26. [¶] (2) Within one day after the court orders the hearing under . . . section 366.26, the advisement must be sent by first-class mail by the clerk of the court to the last known address of any party who is not present when the court orders the hearing under . . . section 366.26."

13

set the matter for a section 366.26 hearing, was provided a Notice of Intent to File Writ Petition form. The clerk also mailed a written advisement of rights. (*Maggie S.*, at p. 671.) We noted that, when "'the juvenile court orders a hearing under section 366.26, the court must orally advise all parties present that if the party wishes to preserve any right to review on appeal of the order setting the hearing under section 366.26, the party is required to seek an extraordinary writ. [Citations.]' [Citation.] This rule applies to all orders . . . made contemporaneously with the setting of the hearing. [Citations.]" (*Ibid.*)

Here, as in *Maggie S.*, *supra*, 220 Cal.App.4th 662, mother was present at the hearing at which the court terminated reunification services and scheduled a section 366.26 hearing, but failed orally to advise mother of the writ requirements. The record reflects that mother was served by mail with all requisite writ materials. Mother did not claim in the trial court that she never received the writ advisement materials, nor does she make that claim on appeal.

The statute requires the court to give an oral advisement to a party present when its orders are made; it failed to do so here. (See *Maggie S.*, *supra*, 220 Cal.App.4th at p. 671; *In re A.H.* (2013) 218 Cal.App.4th 337, 347.) We are not persuaded by DCFS that there is good reason to deviate from *Maggie S.* On the contrary, a compelling argument may be made that good cause exists to excuse failure to comply with the writ requirements in cases, such as this, in which the ICWA is implicated. In such cases, forfeiture of appeal due to parental inaction in the juvenile court impacts a tribe's rights and interests, not just the parent's. The goal of the ICWA is to protect the interests of Indian children and promote the stability and security of Indian tribes by, among other things, permitting tribal participation in dependency actions. (25 U.S.C. § 1901 et seq.; *In re Holly B.* (2009) 172 Cal.App.4th 1261, 1266.) Where, as here, there is reason to believe a child who is the subject of a dependency proceeding is an Indian child, the ICWA requires that the child's tribe be notified of the proceeding and its right to intervene. (25 U.S.C. § 1912(a); see Welf. & Inst. Code, § 224.3, subd. (d); *In re A.G.* (2012) 204 Cal.App.4th 1390, 1396.) As discussed extensively below, DCFS and the court fell short under the ICWA, both as to inquiries that

14

should have been conducted, and notice that should have been perfected. These failures deprived more than one tribe of the opportunity to intervene.

"'Notice is a key component of the congressional goal to protect and preserve Indian tribes and Indian families. Notice ensures the tribe will be afforded the opportunity to assert its rights under the [ICWA] irrespective of the position of the parents . . . . Without notice, . . . important rights granted by the Act would become meaningless.' [Citation.]" (*In re A.G.*, *supra*, 204 Cal.App.4th at p. 1396.) A tribe not notified of a dependency proceeding cannot assert its rights under the ICWA. (*In re Marinna J.* (2001) 90 Cal.App.4th 731, 739.) Because of the tribal interests at stake, courts have held that a parent does not forfeit the issue of ICWA notice violations by raising the issue for the first time on an appeal (*In re Justin S.* (2007) 150 Cal.App.4th 1426, 1435), even where the parent failed to raise the issue at the earliest opportunity (*In re Marinna J.*, at p. 739).

Under the circumstances, good cause exists to excuse mother's failure to comply with the writ requirement. (See *Maggie S.*, *supra*, 220 Cal.App.4th at p. 671; see also *In re Cathina W.* (1998) 68 Cal.App.4th 716, 722–725 [court's failure to advise parent of writ requirements to challenge order setting section 366.26 hearing constitutes "good cause" to excuse parent's failure to comply with that requirement and allow appellate court to reach the issues on appeal from the orders following the section 366.26 hearing]; *In re Rashad B.* (1999) 76 Cal.App.4th 442, 447–450]; *In re Athena P.* (2002) 103 Cal.App.4th 617, 625 [in most cases, juvenile court's failure to advise parent of writ requirements constitutes good cause to relieve parent of the requirement and permit him or her to challenge order setting section 366.26 hearing on appeal].)

II.     *Failure of DCFS and juvenile court to comply with the ICWA requires reversal*

        1.      *The Indian Child Welfare Act generally*

Congress enacted the ICWA to protect the best interests of Indian children and to prevent the erosion of tribal ties and cultural heritage by preserving future Indian generations. In enacting the ICWA, Congress declared that "it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian

children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . ." (25 U.S.C. § 1902.)  Under the ICWA, parental rights may not be terminated absent "'a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.'" (*In re Riva M.* (1991) 235 Cal.App.3d 403, 410, quoting 25 U.S.C. § 1912(f); see 25 U.S.C. § 1912(a) [section applies to involuntary state proceedings for foster care or termination of parental rights where  court knows or has reason to know an Indian child is involved].)  To fully effectuate the ICWA in state Indian child custody proceedings, California enacted a comprehensive reorganization of statutes applying the ICWA, effective January 1, 2007.  (Welf. & Inst. Code, § 224 et seq.; *In re Jack C.* (2011) 192 Cal.App.4th 967, 977 (*Jack C.*); *In re Damian C.* (2009) 178 Cal.App.4th 192, 197.)  In some ways, California's framework provides more protections for Indian children, tribes and parents than the ICWA.  (*Damian C.*, at p. 197 [purpose of legislative reorganization was to broaden interpretation of current laws]; see, e.g., Welf. & Inst. Code, §§ 224, subd. (d), 224.3, subd. (e)(1).)  Both federal and state law, however, expressly provide that if either provides greater protection, that standard prevails.  (*Jack C.*, at p. 977; 25 U.S.C. § 1921; Welf. & Inst. Code, § 224, subd. (d).)

The "ICWA applies to any state court proceeding involving the foster care or adoptive placement of, or the termination of parental rights to, an Indian child.  (25 U.S.C. §§ 1903(1), 1911(a)–(c), 1912–1921.)  'Indian child' is defined as a child who is either (1) 'a member of an Indian tribe' or (2) 'eligible for membership in an Indian tribe and . . . the biological child of a member of an Indian tribe . . . .' (25 U.S.C. § 1903(4).)" (*In re Jonathon S.* (2005) 129 Cal.App.4th 334, 338 (*Jonathon S*.).)  The ICWA applies only to federally-recognized tribes.  (25 U.S.C. § 1903(8); *Jonathon S.*, at p. 338; *In re Wanomi P*. (1989) 216 Cal.App.3d 156, 166–168 [Canadian tribe is not a federally-recognized tribe under ICWA]; *In re A.C.* (2007) 155 Cal.App.4th 282, 286–287.)

16

### a. Tribal rights to notice and intervention

Indian tribes have an interest in the child which is distinct from but on a parity with the parents' interests. To accomplish the ICWA's goals, a tribe has the right to intervene in a dependency proceeding at any time. (25 U.S.C. § 1911(c).) Again, "'this significant right . . . is meaningless unless the tribe is notified of the proceedings'" and afforded a chance to assert its rights, "'"irrespective of the position of the parents . . . or state agencies."'" (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1466; *In re A.G.*, *supra*, 204 Cal.App.4th at p. 1396.) Notice is a pivotal component of the ICWA's goals. It serves the dual purposes of: (1) enabling the tribe to investigate and determine whether a child is an Indian child; and (2) advising the tribe of the pending proceeding and its right to intervene. (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469–470 (*Desiree F.*).)

"Concerning notice, the ICWA provides: '[W]here the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify . . . the Indian child's tribe . . . of the pending proceedings and of their right of intervention. If the identity or location of . . . the tribe cannot be determined, such notice shall be given to the [Bureau of Indian Affairs (BIA)] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by . . . the tribe or the [BIA] . . . .' (25 U.S.C. § 1912, subd. (a); see also 25 U.S.C. §§ 1a, 1903(11).)" (*Jonathon S.*, *supra*, 129 Cal.App.4th at p. 338.) To enforce this provision, the ICWA provides that, "'Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of section [] . . . 1912 . . . of this title.' (25 U.S.C. § 1914.)" (*Jonathon S.*, at p. 338.)

17

### b. *Affirmative and ongoing duty of inquiry*

In every dependency proceeding, DCFS and the juvenile court have an "affirmative and continuing duty" to "inquire whether a child . . . is or may be an Indian child." (§ 224.3(a); rule 5.481(a); *In re W.B.* (2012) 55 Cal.4th 30, 53; *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1165 (*Gabriel G.*).) Once the court or agency "knows or has reason to know that an Indian child is involved, the social worker . . . is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable . . . ." (§ 224.3, subd. (c); rule 5.481(a)(4); *Gabriel G.*, at p. 1165.)

DCFS's duty of "further inquiry" requires "interviewing the parents, Indian custodian, and extended family members . . . , contacting the [BIA] . . . , the tribes and any other person that reasonably can be expected to have information regarding the child's membership status or eligibility." (§ 224.3, subd. (c); rule 5.481(a)(4); *Gabriel G.*, *supra*, 206 Cal.App.4th at p. 1165.) The duty stems from the federal "Guidelines for State Courts; Indian Child Custody Proceedings," (44 Fed. Reg. 67584 (Nov. 26, 1979) (Guidelines), which require the court to "seek verification of the child's Indian status from either the [BIA] or the child's tribe" if there is "reason to believe a child involved in a child custody proceeding is an Indian." (Guidelines, § B.1(a), 44 Fed. Reg. 67586.)[6] In California law, circumstances that provide reason to believe a child may be an Indian child include: "A person having an interest in the child, including . . . a tribe, an Indian organization, . . . or a member of the child's extended family provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe." (§ 224.3, subd. (b)(1); rule 5.481(a)(5)(A); *Gabriel G.*, at pp. 1165–1166.) A court has sufficient "reason to believe" a child is an Indian if a party to the action informs the court the child is an Indian, a

---

[6] We are not bound by the Guidelines. Nevertheless, courts have found the construction of a statute by the agency charged with its administration particularly persuasive (*Jack C.*, *supra*, 192 Cal.App.4th at p. 978, fn. 6), especially regarding ICWA notice requirements (*In re Louis S.* (2004) 117 Cal.App.4th 622, 629.)

child welfare agency "has discovered information which suggests that the child is an Indian child," or an officer of the court involved in the action "has knowledge that the child may be an Indian child." (Guidelines, § B.1(c), 44 Fed. Reg. 67586.)

      *c.      Eligibility for membership and membership in a tribe*

An "'Indian child'" is defined under ICWA as "any unmarried person who is under age eighteen and is either (a) a member of a tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) The definition is largely the same under California law. (Welf. & Inst. Code, §§ 224.1, subd. (a) ["unless the context requires otherwise"], 224.1, subd. (b).) The ICWA applies to children who are eligible to become or who are members of a tribe, but does not limit the manner by which membership is to be defined. (*Jack C.*, *supra*, 192 Cal.App.4th at p. 978; see also *Nelson v. Hunter* (Or.Ct.App. 1995) 888 P.2d 124, 126 fn. 4 [observing that Congress rejected proposed language that would have limited ICWA protection to enrolled members of Indian tribes]. "It is the tribe's prerogative to determine membership criteria." (Guidelines, § B.1, Com., 44 Fed. Reg. 67586; § 224.3, subd. (c).) "A "tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 72, fn. 32 [98 S.Ct. 1670].)

The determination whether the child is an Indian child within the meaning of ICWA depends in large part on an individual tribe's membership criteria. Enrollment may or may not be required for tribal membership. (*United States v. Broncheau* (9th Cir.1979) 597 F.2d 1260, 1263; see, e.g., *In re Jose C.* (2007) 155 Cal.App.4th 844, 849 [children did not meet federal definition of "Indian child" because enrollment was required under tribal law and neither the children nor their mother were enrolled in the tribe]; *In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1425, ["a roll number is not crucial to a determination of the child's [Indian] status"]; *Matter of Baby Boy Doe* (Id.S.Ct. 1993) 849 P.2d 925, 931 [enrollment and membership are not synonymous].)

"Enrollment is the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative." (Guidelines, § B.1(c), 44 Fed.Reg.

19

67586; § 224.3, subd. (e).) "Because of differences in tribal membership criteria and enrollment procedures, whether a child is an Indian child is dependent on the singular facts of each case," and the "decision whether a child is a member of, or eligible for membership in, the tribe is the sole province of the tribe." (*Jack C.*, *supra*, 192 Cal.App.4th at p. 979, 980; § 224.3, subd. (e).) The tribe's determination that a child is a member of or eligible for membership in the tribe is conclusive. (§ 224.3, subd. (e)(1).) In California, where ambiguity exists as to a child's Indian status, there are procedural protections for a non-enrolled Indian child. Section 224.3 provides that, "[i]nformation that the child is not enrolled or eligible for enrollment in the tribe is *not determinative* of the child's membership status *unless the tribe also confirms in writing that enrollment is a prerequisite for membership* under tribal law or custom." (§ 224.3, subd. (e)(1), italics added; see *Jack C.*, at p. 981; rule 5.482(c).)

Issues of law under the ICWA are reviewed de novo. (*Jack C.*, *supra*, 192 Cal.App.4th at p. 977.) ICWA findings are reviewed for substantial evidence. (*In re D.N.* (2013) 218 Cal.App.4th 1246, 1251 [substantial evidence test applies to notice findings made under ICWA].)

Having set forth the applicable law, we turn to the question of whether it was violated here.

### 2. *S.J. was an Indian Child*

Mother contends the court erred when it failed to find S.J. was an Indian child and that the ICWA applied to this action until after reunification services terminated. She maintains that S.J. always qualified as an Indian child under the ICWA and California law. Further, to the extent there was ambiguity as to whether S.J. met the definition of an Indian child, the court was required by rule 5.482(c) to proceed as if she was an Indian child, and was certainly required to do so once it learned of her Indian status in December 2012. Mother maintains that she notified the court that S.J. was an Indian child at the outset, but the court failed to ensure that DCFS complied with ICWA's inquiry and notice requirements. DCFS argues that the information initially provided by mother was insufficient to trigger ICWA's inquiry or notice requirements. DCFS further argues that, by the time the case

20

legitimately was considered an ICWA matter and the Osage Nation tribe intervened, good cause was shown to maintain S.J. in her non-Indian placement. DCFS concedes that once the case was deemed an ICWA case, some notice errors may have occurred. But the agency claims those errors may be cured by a limited reversal.[7]

a. *The court and DCFS failed to perform their ongoing duty to inquire regarding S.J.'s Indian status*

At the outset of this action, mother told DCFS and the court she was a registered member of the Sweetgrass First Nation in Canada, and filed the required form identifying her Indian ancestry. At the detention hearing on June 2, 2011, she told the court she had grown up on the tribe's reservation until she was 16, and her tribe had one or more sister tribes in Montana. Grandfather told DCFS and the police he was a Canadian born Indian from the Cree Tribe, and gave police a copy of the Jay Treaty. The court informed mother that the ICWA applied only to American Indians, but nevertheless instructed DCFS to conduct a further investigation. Mother raised the issue again in July and August 2011. On August 1, 2011, DCFS informed the court that grandfather and mother continued to insist the matter be treated as an ICWA case, but had not provided any documents. The court observed that the Cree tribe was not federally registered. Accordingly, the case was "not an I.C.W.A. case," and the court had no reason to know otherwise and did "not want [DCFS] sending out notices until [it] got a court order showing [the court] this is an I.C.W.A. case . . . ."

Mother's information raised the possibility that she and S.J. were affiliated with a tribe in Montana. This triggered DCFS's duty to further inquire. Once the court or DCFS "knows *or has reason to know* that an Indian child is involved" further inquiries must be made, as soon as practicable, regarding the child's possible Indian status. (§ 224.3, subd. (c), italics added; rule 5.481(a)(4); *Gabriel G.*, *supra*, 206 Cal.App.4th at p. 1165.) The information about the Montana tribes was "information suggesting the child is . . . eligible

---

[7] DCFS concedes it did not properly notice the Blackfeet tribe and at oral argument conceded that other tribes should also have received notice. DCFS claims those errors can be rectified by a limited remand with instructions to perfect notice.

for membership in a tribe" under section 224.3, subdivision (b)(1). The record reflects that the court agreed further inquiry was in order, and instructed DCFS to follow up on the information to investigate S.J.'s Indian ancestry. In addition, the section 730 evaluation filed in April 2012, reveals that both S.J.'s maternal aunt and grandmother and aunt are Canadian Indians who live in Canada. It also revealed that mother and grandfather are in regular contact with S.J.'s maternal great-great grandmother in Canada, with whom mother had lived for a time during her childhood, and with whom she spoke regularly.

To fulfill its duty of "further inquiry," DCFS was required to interview the parents and extended family, and contact the BIA, tribes or anyone else who reasonably could be expected to have information regarding S.J.'s Indian status or eligibility for membership. (§ 224.3, subd. (c); rule 5.481(a)(4); *Gabriel G.*, *supra*, 206 Cal.App.4th at 1165.) There is no indication here that DCFS made an effort to identify, contact or interview members of S.J.'s extended family, even though several, presumably, could readily have been reached by phone. It is particularly troubling that DCFS made no effort to interview grandfather, although it had his address (because mother lived with him), and he was actively involved in the dependency action and regularly attended court hearings, therapy sessions and monitored visits. Nor did DCFS make any effort to contact S.J.'s maternal aunt, grandmother or great-great-grandmother, to whom mother spoke regularly. Had DCFS done so, it presumably would have obtained the same information mother and grandfather were able to gather themselves to establish their ancestral ties to at least three federally-recognized tribes—the Blackfeet Nation and the Rocky Boy Chippewa Cree Nation in Montana, and the Osage Nation of Oklahoma. This error was not harmless. Mother definitively established S.J.'s membership in one tribe, which intervened to protect its interests. Other tribes must still be notified, and given an opportunity to evaluate S.J.'s membership status and determine whether intervention is appropriate. Where a child may be eligible for membership in more than one tribe, notice to one tribe does not protect the rights of other interested tribes. (*Desiree F.*, *supra*, 83 Cal.App.4th at pp. 475–476.) Notice must be "sent to *all tribes* of which the child may be a member or eligible for membership, *until the court makes a determination as to which tribe is the child's tribe* in accordance with subdivision (d) of

22

Section 224.1, after which notice need only be sent to the tribe determined to be the Indian child's tribe."[8] (§ 224.2, subd. (a)(3), italics added; see Guidelines, 44 Fed.Reg. 67586–67587.)

  b.  *Notice violations after the review hearing*

  Under ICWA, notice is required once it is known, or there is reason to believe, the child is Indian. (25 U.S.C. § 1912(a); Welf. & Inst. Code, §§ 224.2, subd. (a), 224.3, subd. (d); rule 5.481(b); *In re W.B.*, *supra*, 55 Cal.4th at p. 53.) Notice requirements are strictly construed, and only a minimal showing is necessary. "[T]he bar is indeed very low to trigger ICWA notice," and "'only a suggestion of Indian ancestry'" is necessary." (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401,1408; *Gabriel G.*, *supra*, 206 Cal.App.4th at p. 1165; rule 5.481(a)(5)(A); *In re Miguel E.* (2004) 120 Cal.App.4th 521, 549.) The information conveyed to DCFS and the court from June through December 2011 by mother and grandfather was sufficient to trigger the notice requirements.

  Although mother identified herself as a member of a non-federally recognized tribe, she also mentioned that tribe's affiliation with "sister tribes" in the United States. Grandfather identified one tribe as the Cree tribe in Montana (also not a federally recognized tribe).[9] Depending on the circumstances of an individual case, information that a child or parent is a member of a non-federally recognized tribe may be sufficient to trigger the ICWA notice requirements. In *In re Louis S.*, *supra*, 117 Cal.App.4th 622, the child welfare agency knew the child's grandparent was Apache and the child was eligible for

---

  **[8]** Section 224.1 provides the standard the court must follow to determine which is the child's tribe in cases in which a child is a member of or eligible for membership in more than one tribe. (§ 224.1, subd. (e).)

  **[9]** It is not difficult to identify federally-recognized tribes. The Secretary of the Interior periodically publishes the names, addresses and designated agents for service of notice of ICWA proceedings of all federally-recognized tribes in the Federal Register. (25 C.F.R. § 23.12; *In re J.T.* (2007) 154 Cal.App.4th 986, 992.) The California Department of Social Services also has a web site listing tribes entitled to ICWA notice. (http://www.childsworld.ca.gov/res/pdf/CDSSTribes.pdf.)]

membership in the Chiricahua Tribe, a non federally-recognized Apache band. However, the agency knew that the Chiricahua might have merged with at least one federally-recognized tribe. Under the circumstances, the court found the agency should have notified the BIA and any federally-recognized tribe that had absorbed the Chiricahua. (*Id*. at pp. 632–633.) In *In re S.B.* (2008) 164 Cal.App.4th 289, the court held that, just because the record contained information that a grandparent was a Mescalero Apache (a band of a federally-recognized tribe), did not absolve the child welfare agency of the obligation to contact the BIA to determine whether the child might *also* be a member of or eligible for membership in other federally-recognized Apache Tribes. (*Id*. at p. 303.) The reasoning in these cases reflects a recognition that an Indian child may have ancestors who were members of multiple tribes, which might make the child a member of, or eligible for membership in, more than one tribe. (See § 224.1, subd. (e) [providing standard for the court to follow to determine which tribe is child's tribe in Indian child custody proceeding if child is a member of or eligible for membership in more than one tribe].)

*In re Hunter W.*, *supra*, 200 Cal.App.4th 1454, on which DCFS relies to argue that no notice was required here, is inapposite. There, the court found the information provided too speculative to trigger the ICWA notice requirements where "mother indicated she may have Indian heritage through her father and deceased paternal grandmother. She could not identify the particular tribe or nation and did not know of any relative who was a member of a tribe. She did not provide contact information for her father and did not mention any other relative who could reveal more information." (*Id*. at p. 1468.) The circumstances here—in which grandfather named at least one tribe in the United States, and DCFS knew about the Indian ancestry of numerous maternal relatives, whom it could readily have contacted—differ markedly.

On this record, we conclude the juvenile court failed to ensure that DCFS fully complied with the ICWA's notice requirements. First, as discussed above, mother's statement that her Canadian tribe might have affiliated tribes in Montana, while vague and without mention of a particular tribe was, as the court recognized, sufficient to trigger

24

DCFS's obligation to make further inquiries under the ICWA. A child's Indian status need not be certain to invoke ICWA notice requirements. (*Desiree F.*, *supra*, 83 Cal.App.4th at p. 471.) "The showing required to trigger the statutory notice provisions is minimal," and a mere suggestion or "hint may suffice." (*In re Miguel E.*, *supra*, 120 Cal.App.4th at p. 549; *In re Alice M.* (2008) 161 Cal.App.4th 1189, 1199 (*Alice M.*).) As the *Alice M.* court explained: "We posit that there are many instances in which vague or ambiguous information is provided regarding Indian heritage or association (e.g., 'I think my grandfather has some Indian blood.'; 'My great-grandmother was born on an Indian reservation in New Mexico'). In these types of cases, . . . inquiry is necessary before any attempt at notice to a specific tribe even can be made." (*Alice M.*, at p. 1200.) Parents are not necessarily informed about tribal government or membership criteria, or their interests may diverge from those of the tribe. To maintain stability and avoid unnecessary delay in placements in dependency proceedings, it is preferable to err on the side of giving notice and to engage in a prompt, thorough examination of whether a child is an Indian child. (*Miguel E.*, at p. 549.)

We conclude that on this record, DCFS had a duty under the ICWA to, at a minimum, more thoroughly inquire into mother's Indian ancestry to determine whether notice to one or more tribes was required and, if so, to provide proper notice to the appropriate entities. Specifically, after being put on notice of mother's Indian ancestry and her possibly affiliation with federally recognized tribes, DCFS should have conducted an investigation of S.J.'s Indian ancestry. That inquiry was both necessary and not unduly burdensome. DCFS had regular contact with mother and grandfather throughout these proceedings, providing ample opportunity for a more thorough inquiry consistent with the requirements of the ICWA. In addition, by December 2012, mother and grandfather were able to gather information regarding the family's Indian ancestry. There is no reason DCFS could not have also obtained that information, particularly in light of its "affirmative and continuing duty" to inquire whether a child is or may be an Indian child for purposes of the ICWA. (§ 224.3, subd. (a).) Again, we emphasize that in the absence of proper notice to a tribe of a dependency action, the purposes of the

25

ICWA cannot be fulfilled. The failure of DCFS to conduct a proper inquiry here precluded compliance with both the language and spirit of the ICWA's notice provisions.

The orders terminating reunification services, setting the matter for a section 366.26 hearing and all subsequent orders, must be reversed, and remand is necessary to permit the juvenile court to ensure compliance with the ICWA's provisions, including inquiry, notice and its evidentiary standards and procedural requirements. We acknowledge that our decision further delays permanency for S.J., who is approaching her fourth birthday. As the court in *Alice M.*, *supra*, 161 Cal.App.4th 1189 stated: "We regret that ICWA errors often delay the resolution of dependency proceedings, but cannot conclude that the prospect of such a delay excuses noncompliance at the expense of those that ICWA is intended to protect. [Citation]" (*Alice M.*, at p. 1197.) Reversal for ICWA compliance at this late stage is antithetical to the policy that dependency cases be resolved expeditiously. But "'[n]oncompliance with ICWA has been a continuing problem in juvenile dependency proceedings conducted in this state, and, by not adhering to this legal requirement, we do a disservice to those vulnerable minors whose welfare we are statutorily mandated to protect.' [Citation.] This case is an example of [DCFS's] noncompliance that needlessly delays a victimized child's ability to find security and stability in a permanent home. The cost is disruption and trauma for both the child and [her] caretakers. Reluctantly, therefore, but with no choice in the matter, we remand the matter for [DCFS] to make adequate inquiry and send ICWA-compliant notice to all relevant tribes." (*In re A.G.*, *supra*, 204 Cal.App.4th at pp. 1401–1402.)

One issue remains. Under ICWA, a violation of the notice provisions may constitute cause to invalidate a child custody proceeding. Section 1914 provides: "Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912 and 1913 of this title." (25 U.S.C. § 1914; see Welf. & Inst. Code, § 224, subd. (e); rule 5.486(a).)

26

Generally speaking, the trial court is the court of original jurisdiction to consider a petition to invalidate under section 1914. (Rule 5.486(b).) At the December 11, 2012 hearing, mother submitted a one paragraph petition seeking to invalidate all proceedings, based on inquiry and notice violations. The juvenile court has never addressed or ruled on that request.[10] Mother invites this court to treat her appeal as a petition to invalidate all orders, rather than require her to file a renewed petition following remand. We will not.

We agree with DCFS that an appellate court is not a "court of competent jurisdiction" for purposes of such a petition. As mother acknowledges, this issue was recently resolved against her in *Jonathon S.*, *supra*, 129 Cal.App.4th 334, a decision she urges us to disregard. In *Jonathon S.*, the court held that an appellate court, is not a "court of competent jurisdiction" within the meaning of the enforcement provision of the ICWA because, among other reasons, "in many instances, a petition under the enforcement provision will require the resolution of disputed factual issues. We are just not the right kind of court." (*Id*. at p. 341.) "Any petition under the enforcement provision to invalidate an order in an open dependency [proceeding] must be filed in the juvenile court; only after the juvenile court renders an appealable ruling on the petition can we review the issues on appeal." (*Id*. at p. 342 [disagreeing with courts which have suggested that an appeal regarding an ICWA violation is itself a petition under the Act's enforcement provision].) Although, unlike *Jonathon S.*, substantive provisions of the ICWA have been triggered for S.J. who is indisputably an Indian child, numerous fact intensive issues remain to be resolved (e.g., which, if any, other federally recognized tribes is S.J. eligible for membership in, or a member of; and among the tribes, which has the more significant contacts with her (§ 224.1, subd. (e)(2)). Further, properly noticed tribes may decline to intervene following remand. In that event, we are not convinced

---

[10] Although the copy of the petition in the record does not contain a file-stamp, there is no dispute that it was submitted on December 11, 2012.

that the juvenile court's ruling with regard to the Osage Nation's determination that good cause exists to depart from the ICWA placement preferences, and that it is in S.J.'s best interest to permit her to remain in her non-ICWA compliant placement, will not withstand scrutiny. Clearly, these are factual questions, and this is not the forum to resolve such issues. Indeed, some of those issues may be resolved only by the involved tribes on an individual basis (i.e., whether S.J. is a member of or eligible for membership in the tribe).

In conclusion, we agree that the failure of the juvenile court and DCFS to adhere to the notice mandates of the ICWA and state law requires reversal of the orders made December 11, 2012, and all subsequent orders. The matter must be remanded to permit the court and DCFS to conduct further inquiries, provide appropriate notice and to proceed in accordance with ICWA requirements in this action involving an Indian child.[11]

---

[11] Our conclusion renders moot mother's arguments that the juvenile court failed to adhere to the ICWA's evidentiary requirements; erred in refusing to grant her request for a continuance of the combined 12/18 month hearing to permit tribal notice; violated her right to due process at the section 366.26 hearing by considering documents she had not had an opportunity to review; and erred when it ordered parental rights terminated.

Our conclusion also renders moot mother's argument that there is no substantial evidence to support the court's finding that good cause exists to bypass ICWA and state law placement preference standards. We do however, agree with mother that, on this record, it appears that DCFS failed adequately to assess grandfather as a relative placement, under the criteria set forth in section 361.3. On remand, the juvenile court shall require DCFS to conduct an appropriate assessment of grandfather, in accordance with placement preferences under state law and the ICWA (see §§ 224, 361.3, 361.31, subds. (f), (h); 25 U.S.C. §§ 1901, 1915(a)(1)–(3), (d).)

**DISPOSITION**

The December 11, 2012 orders terminating reunification services and setting this action for a selection and implementation hearing, and all subsequent orders, are reversed. The matter is remanded to the juvenile court with directions to conduct a new Welfare and Institutions Code section 366.22 review hearing and further proceedings in conformity with the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.), and California law implementing that act (Welf. & Inst. Code, § 224 et seq.). The juvenile court is further directed to order Department of Children and Family Services to conduct a new assessment of S.J.'s maternal grandfather in accordance with the requirements of Welfare and Institutions Code section 361.3 and the ICWA.

NOT TO BE PUBLISHED.


JOHNSON, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

29