Filed 9/25/13  Certified for publication 10/16/13 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MAGGIE S.,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Real Parties in Interest. | B247306<br><br>(Los Angeles County<br>Super. Ct. No. CK60010) |

ORIGINAL PROCEEDING; petition for extraordinary writ, Philip L. Soto, Judge. Petition granted.

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Petitioner.

No appearance by Respondent.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Senior Deputy County Counsel, for Real Parties in Interest.

_____

Maggie S. (Mother), who was incarcerated when she gave birth to A.C., appeals from the trial court's February 27, 2012 jurisdictional and dispositional orders adjudging A.C. a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (g).[1]  Mother contends that the court erred in asserting jurisdiction over A.C., because contrary to the representations of the Department of Child and Family Services (DCFS), at the time of the jurisdiction hearing she had made arrangements for A.C.'s care by Mother's godmother Mary K.  We construe Mother's appeal as a petition for extraordinary writ.  We agree with Mother that jurisdiction was improperly asserted, and we grant the petition and reverse the jurisdictional and dispositional orders of the court.

## BACKGROUND

**January 6, 2012 petition and detention report**

On January 6, 2012, DCFS filed a petition pursuant to section 300, subdivisions (b) and (g) on behalf of seven-day-old A.C.  The petition alleged under both subdivisions that on the date of A.C.'s birth, December 30, 2011, Mother "was incarcerated and . . . made an inappropriate plan for the child's ongoing care and supervision in that the child's maternal uncle, [A.S.], and the maternal grandparents, are unwilling to provide care of the child.  Such an inappropriate plan for the child's care and supervision by the mother endangers the child's physical health and safety and creates a detrimental home environment, placing the child at risk of physical harm and damage."

Mother was at the time incarcerated at the California Institution for Women for selling drugs, and was due for release in July 2013.  Mother gave birth to A.C. at Riverside County Regional Medical Center, where A.C. remained.  Both Mother and A.C. tested clean and free of any drugs.[2]

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] A.C.'s father was found to be an alleged father only, and is not a party to this appeal.

2

The detention report, also dated January 6, 2012, stated that the hospital told the social worker that Mother had given verbal consent to release A.C. to the maternal grandparents and maternal uncle. The social worker contacted the maternal uncle, who at first reluctantly agreed to care for A.C., but then called back on January 4, 2012 and stated that neither he nor the maternal grandparents were interested in caring for the baby. That same day, January 4, the social worker called Mother, who stated that the hospital had made a mistake, and she had given *written* consent to release A.C. to maternal uncle and grandparents. According to the petition, "Mother identified her Godmother, [Mary K.], as a prospective placement for the child but [the social worker] was unable to reach her." The social worker called Mary K. and "left a detailed message but as of the writing of this report, [Mary K.] has not yet contacted" the social worker. DCFS detained the child because there were "no appropriate relatives at this time." [3]

Mother had a prior DCFS case regarding two other daughters by a different father, who were detained from her care in 2005 with allegations that Mother had a history of substance abuse, had engaged in criminal conduct (assault and attempted robbery) in the presence of one child, and Mother and the children's father had a history of domestic violence against each other. Mother failed to reunify with the children, and in 2009 her parental rights were terminated and the girls were adopted by a foster family.

Mother told the social worker she wanted custody of A.C. and would comply with all court orders to reunify with A.C. While in prison, Mother was enrolled in parenting classes, Narcotics Anonymous, Alcoholics Anonymous, and an anger management program.

At the detention hearing on January 6, the juvenile court detained A.C. from Mother's custody, and ordered monitored visitation of three hours, three times a week.

---

[3] The social worker stated that the prison informed her that Mother had signed a document in November 2011 designating the maternal uncle and grandparents as prospective caregivers for the child; a copy of this document was given to the hospital. As explained below, that document actually designated the maternal uncle and Mary K. as prospective caregivers.

**February 6, 2012 jurisdiction and disposition report**

A month later, on February 6, DCFS filed its jurisdiction and disposition report. A.C. had been placed in a foster home. The report repeated that after the maternal uncle and grandparents declined to care for A.C., the social worker had been unable to reach Mary K. by telephone, and added, "The mother believes that the child need[s] to be with [a] relative until the mother's release from the prison." Mother had had no visits, because DCFS and the foster agency did not work on Saturdays, the only day that the prison allowed visits, and the prison was between 120 and 130 miles away from the foster home. "[T]ransporting a month old baby such long distance to visit the mother in a prison setting is not in the child's best interest." DCFS had investigated Mary K., and learned that she had been licensed for foster care with San Bernardino but no longer had a license, due to "'physical and mental health problems.'" Her application to become a foster parent through an agency was rejected because she did not authorize release of her medical records. As a result, "placing the child with the . . . mother's godmother is not an option at this time." DCFS indicated that it would file an amended petition, adding a count of failure to reunify and termination of parental rights as to the older children. No amended petition was ever filed.

Attached to the report was a "Newborn Placement Information Form" dated November 15, 2011, a month and a half before A.C.'s birth. Mother had filled out and signed the form, and under "whom I will contact to care for my newborn," Mother designated the maternal uncle and godmother Mary K. (with name, address, and telephone number). Mother appeared in court, in custody, on February 14, 2012, denied the allegations, and requested a jurisdiction hearing.

**February 27, 2012 jurisdiction and disposition hearing**

At the jurisdiction and disposition hearing on February 27, 2012, Mother was again present in custody. DCFS asked the court to sustain the petition: "The mother was incarcerated, made an inappropriate plan, and she's unable to really provide an appropriate plan for the child under the circumstances." Mother's counsel asked that the petition be dismissed, arguing that Mother had been trying to place A.C. with an

4

appropriate relative since she was in the hospital: "She had told a hospital personnel to give the child to maternal uncle and to maternal grandparents. However, due to some mix-up in the hospital, the maternal uncle was not called until the child was taken into the D.C.F.S. custody. And then, that's when the D.C.F.S. officers find out that maternal uncle and maternal grandparents were not willing to take care of the child." Mother had since provided another name (a distant family relative,[4] not Mary K.), and "has been trying, even though behind bars and when she was in the hospital" to make a plan for A.C. with a relative. DCFS repeated that "Mother failed to make an appropriate plan," and A.C.'s counsel stated: "It appears that Mother did try to make an appropriate plan in having the child placed with relatives, but those relatives were unable to care for the child. So, obviously, there wasn't an appropriate plan to be made." The court denied a request by Mother's and A.C.'s counsel to continue disposition until the distant relative could be investigated.

Mother offered stipulated testimony that she had enrolled in parenting classes and had been attending for three weeks, and continued to participate in counseling for substance abuse and anger management. She was scheduled for release in a year and four months, in early July 2013.

DCFS (joined by A.C.'s counsel) requested that no reunification services be offered to Mother, citing section 361.5, subdivisions (b)(10), (b)(11) (reunification had been terminated as to half siblings and parent had not made a reasonable effort to treat the problems leading to removal), and (e) (mother was incarcerated and providing services would be detrimental to the child). Mother's counsel requested reunification services, arguing that Mother had begun parenting classes and had been participating in anger management and substance abuse programs to address her problems, and "ha[d] actively asked the social worker and this court to place the child with her . . . distant relative. So

---

[4] Counsel for DCFS stated that this other person had other adults living in the house who needed to be "checked . . . out;" Mother and her counsel indicated that she was related to Mother by marriage.

it's clear that her intention[] is to stay in this child's life and to keep having contact with this child."

The court declared A.C. a dependent under section 300, subdivisions (b) and (g), ordering DCFS to place A.C. in appropriate shelter care with discretion to release A.C. to any appropriate relative other than the parents. The court found that DCFS had made "reasonable efforts to return the child to a safe home," Mother had failed to reunify with older half-siblings and had not made reasonable efforts to treat the problem that led to the removal of those siblings, and Mother would be incarcerated until July 2013. The court set a hearing under section 366.26 to select a permanent plan, giving Mother monitored visits in accordance with prison rules while Mother was incarcerated, and three monitored three-hour visits a week after her release. The court advised Mother that she knew what she had done, and the rulings were for Mother's own good: "I try to grant reunification services, but I cannot make the finding in your favor."

**June 25, 2012 and August 27, 2012 reports**

On May 17, 2012, and again on June 25, the trial court ordered DCFS to evaluate Mary K. as a placement resource. A DCFS report dated June 25, 2012 stated "such placement is not appropriate." The report stated that the social worker spoke with Mary K. on *January 4, 2012* (two days before DCFS filed the petition stating that it could not reach Mary K. and Mary K. had not returned the social worker's call). Mary K. said she was a friend who had known the family for many years; Mother had discussed placing A.C. with her, and Mary K. agreed to care for the child until Mother got out of jail, although she did not want to adopt. Mary K. lived with her husband, and they would submit to a live scan. She offered to assist with the reunification process.

The next day, January 5, 2012 (a day before the petition was filed), Mary K. called the social worker and told her: "'I feel I need to be honest with you. I am taking care of a 2 1/2 month old baby who lives in my home'" and whose mother was incarcerated. The baby's mother had promised to but had not yet given Mary K. written authorization to seek medical care for the baby, and the baby's pediatrician told Mary K. he would no longer provide care without authorization. (A referral to the San Bernardino County

DCFS was made on the baby's behalf.) Mary K. had met A.C.'s mother through church and had a lengthy relationship with her. On January 10, the social worker learned of Mary K.'s prior foster care license with San Bernardino and the rejection of Mary K.'s application to be a foster parent through an agency, due to her failure to release her medical records. In early May (after A.C. had been declared a dependent, and before the court order that DCFS investigate Mary K. as a caregiver) Mary K. again stated she did not want to adopt A.C.

The June 25, 2012 report stated Mother had yet to have a visit with A.C. at the prison, pending the prison's receipt of an original birth or hospital certificate (and by June 21, 2012 DCFS still had not obtained one). The foster mother was interested in adopting A.C.

DCFS filed a status review report on August 27, 2012, stating that pursuant to the court's order the social worker contacted Mary K. on June 27, 2012, asking if Mary K. would care for A.C. to facilitate visits between Mother and A.C. At first, Mary K. stated that she was interested in caring for A.C. until Mother was released from prison, but the next week Mary K. called "and stated that she had changed her mind about even caring for [A.C.]."

Mother finally had her first visit with eight-month-old A.C. on August 8, 2012, when DCFS brought A.C. to the prison; the visit went well and Mother called the social worker to thank him.

**Mother's section 388 petitions**

On August 13, 2012, Mother filed a section 388 petition asking the court to change its order and "stop the adoption." Mother stated she wanted to get A.C. back and reopen the case with her other two daughters because "a lot is changing here in prison," where she had finished parenting and substance abuse classes and was enrolled in anger management classes. Mother wanted to "push issue on visits" with A.C., and "the unconditional love that a mother has for her children will never be replaced with another person." The court denied the request as circumstances had not changed and it would not be in the best interest of A.C. to change the order.

Through counsel, Mother filed another section 388 petition on September 10, 2012, requesting that the court order family reunification services and vacate the section 366.26 hearing, "or, in the alternative, place [A.C.] with [Mary K.]." The court ordered a hearing on the section 388 petition, calendared for September 24, 2012. In response to Mother's petition, DCFS again described its contact with Mary K. on June 27, 2012: "[D]ue to [Mary K.'s] statement th[at] she no longer wants to care for [A.C.] and [her] application being rejected by San Bernardino County licensing, DCFS does not recommend that the infant be replaced to the care of [Mary K.]."

A December 7, 2012 report detailed five successful visits between A.C. and Mother, during which Mother met and exceeded five core effective parenting skills, and was receptive to constructive criticism or feedback. Mother, who was tearful after the initial visits, was "'very cooperative, motivated, and very interested.'" The visits afforded no opportunity to assess Mother's parenting skills, and A.C. "does not know [Mother] as her parent." A home-study had been approved for A.C. to be adopted by the foster parent who had cared for A.C. since January 2012.

**January 27, 2013 hearing on sections 388 and 366.26**

After numerous continuances, the section 388 and section 366.26 hearing took place on January 27, 2013, with Mother present by telephone. Mother's service coordinator testified that Mother was "very nurturing . . . within the confines of the program" during seven monthly monitored one-hour visits, and A.C. was happy and responsive. Mother testified that her circumstances had changed since her incarceration in 2011; she "became a better person" and realized what she had to change to be productive. She played with and nurtured A.C. during her visits, and the baby smiled and responded. Her plan after release was to get into a residential program that would take children, and continue her enrollment in classes. In the five months that she had visits with A.C., "she's been bonding perfectly with me, and I've been bonding perfectly with her. She knows me a little bit."

Counsel for Mother acknowledged that Mother had not had much contact with A.C., but she "has been locked behind bars and the access for a child is not up to her."

8

Given Mother's successful visits and her plans to enter a program, it would be in A.C.'s best interests for Mother to receive family reunification services. In the alternative, counsel requested that the court continue to explore placement of A.C. with Mary K., "though there's a slew of problems with her," rather than terminate Mother's parental rights. Counsel for DCFS argued that circumstances had not changed, although they might be "changing" with Mother's acknowledgment that she would choose residential treatment; after Mother's release and six months of drug treatment, it would be December 2013 and A.C. would be two years old. A.C. had seen Mother less than ten hours in all, so circumstances had not changed and it was not in A.C.'s best interest to grant Mother reunification services. A.C.'s counsel agreed, and argued that it would "retraumatize" A.C. to pull her out of the only home she had known.

The court denied the section 388 petition, concluding that the situation had not changed and it would not be in A.C.'s interests to provide reunification services or place A.C. "with someone who has not been found to be appropriate."

The court turned to section 366.26. Mother testified that it would "physically and mentally . . . mess [A.C.] up" to terminate Mother's parental rights, because "I've already bonded with her. She's already starting to attach with me." The court acknowledged "the situation is difficult if not desperate for you because of your incarceration," but there was more to the mother-child bond than just a few visits. Mother protested that she had been trying hard to set up the visits since A.C.'s birth in January, but the visits had only just started.

The court ruled on the section 366.26 motion, terminating Mother's parental rights and finding by clear and convincing evidence that A.C. was adoptable, with the foster parents as prospective adoptive parents. The court directed DCFS to allow Mother one last visit with A.C.

## DISCUSSION

**A.     We construe Mother's purported appeal as a petition for extraordinary writ.**

DCFS filed a motion to dismiss Mother's appeal because Mother failed to file a petition for extraordinary writ to challenge the juvenile court's February 27, 2012 finding

9

of jurisdiction, disposition, and setting of the hearing under section 366.26. We deny the motion and construe Mother's purported appeal as a petition for extraordinary writ.

When at the disposition hearing the juvenile court denies family reunification services and sets a section 366.26 hearing, "'the traditional rule favoring the appealability of dispositional orders yields to the statutory mandate for expedited review.'" (*In re Athena P.* (2002) 103 Cal.App.4th 617, 625; Cal. Rules of Court, rule 8.450.) "An order setting a section 366.26 hearing 'is not appealable; direct appellate consideration of the propriety of the setting order may be had only by petition for extraordinary writ review of the order. (§ 366.26, subd. (*l*); [citations].)' [Citation.] When the juvenile court orders a hearing under section 366.26, the court must orally advise all parties present that if the party wishes to preserve any right to review on appeal of the order setting the hearing under section 366.26, the party is required to seek an extraordinary writ. [Citations.]" (*Jennifer T. v. Superior Court* (2007) 159 Cal.App.4th 254, 259.) This rule applies to all orders (in this case, the order finding jurisdiction) made contemporaneously with the setting of the hearing. (Cal. Rules of Court, rule 8.450; *In re Anthony B.* (1999) 72 Cal.App.4th 1017, 1023.)

Mother was present at the February 27, 2012 hearing at which the court found jurisdiction over A.C., denied Mother reunification services, and set the section 366.26 hearing, but the court failed to orally advise Mother of the writ requirement. The minute order for February 27 states "parent(s) is/are served Notice of Intent to File Writ Petition pursuant to California Rules of Court 39.1B and 1436.5." A certificate of mailing dated the day of the hearing states that the minute order, the form notice of intent to file writ petition, and an advisement of rights, was sent to Mother at the prison. But "[T]he court must give an oral advisement to parties present at the time the order is made," and the court failed to do so in this instance. (*In re A.H.* (2013) 218 Cal.App.4th 337, 347.) We therefore excuse Mother's lack of compliance with the writ requirement, and construe her purported appeal as a petition for extraordinary writ.

**B.     The court erred in finding jurisdiction because Mother had arranged for the care of A.C.**

The trial court sustained jurisdictional allegations over A.C. under section 300, subdivisions (b) (failure to protect) and (g) (incarcerated parent's failure to arrange for child's care).  The identical allegations stated that Mother was incarcerated and "made an inappropriate plan for the child's ongoing care and supervision in that the child's maternal uncle, [A.S.], and the maternal grandparents, are unwilling to provide care of the child."  The record shows, however, that Mother designated in writing not only her maternal uncle, but also her godmother Mary K., who on January 4, 2012, had told DCFS that she was willing to care for A.C.  Nevertheless, the social worker reported in the January 6 detention report and the February 6 jurisdiction/disposition report that mother had designated only the maternal grandparents and uncle, had mentioned Mary K. only after maternal relatives were unwilling to care for A.C., and, most importantly, that the social worker had been *unable to reach Mary K*.  The court was thus unaware at the jurisdiction/disposition hearing that A.C. had designated Mary K. in writing as a caregiver for A.C.  The court also was not informed by DCFS that two days before the detention report, a month before the jurisdiction/disposition report, and almost two months before the jurisdiction/disposition hearing, the social worker had spoken to Mary K, who said she was willing to care for A.C.  This misinformation led the court to believe that Mother had not arranged for A.C.'s placement with a willing caregiver, resulting in a finding of jurisdiction that set in motion a chain of events that resulted in the termination of Mother's parental rights.

"There is no 'Go to jail, lose your child' rule in California.  [Citation.]"  (*In re S.D.* (2002) 99 Cal.App.4th 1068, 1077.)  Section 300 subdivision (g) provides for jurisdiction when "the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child."  "If [the mother] could *arrange for* care of [the minor] during the period of her incarceration, the juvenile court had no basis to take jurisdiction in this case, and [DCFS] simply had no say in the matter."  (*Ibid*.)  The court in this case found that Mother "cannot arrange for the care of the child" on the basis of incomplete

11

information.  Contrary to DCFS's representations, Mother had designated Mary K. on the written form she signed before A.C.'s birth, and Mary K. told the social worker that she was willing to care for A.C.  "Those facts alone would be sufficient to compel a conclusion that [mother] was in a position to *arrange* for [A.C.'s] care" (*id*. at p. 1078) at the time of the jurisdiction/disposition hearing on January 6, 2012.

DCFS argues that the agency later learned that Mary K.'s foster care license had been revoked due to physical and mental health issues, so that Mary K. "was not a suitable placement."  "Nothing in section 300, subdivision (g) even requires an incarcerated parent such as [mother] to prove affirmatively the suitability of her caretaking arrangements.  It requires only that she be able to make the arrangements.  If [DCFS] wishes to challenge the suitability of those arrangements, it must proceed under a different clause of subdivision (g), providing that jurisdiction is also appropriate where 'a relative or other adult custodian [such as Mary K.] with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful.'  Of course, the fact that this provision requires not only proof of an unsuitable placement, but also that the parent cannot be located, suggests that even if the initial arrangements do not work out, an incarcerated parent (who certainly could be located) would have the opportunity then to make other arrangements." (*In re S.D.*, *supra*, 99 Cal.App.4th at p. 1079.)

Nor was jurisdiction proper under section 300, subdivision (b), which "'means what it says.  Before courts and agencies can assert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial risk* of *serious physical* harm or illness.' [Citations.]" (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366.)  The risk must exist at the time of the hearing. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.)  DCFS does not argue that such a substantial risk of serious physical harm existed at the time of the hearing at the end of February 2012, and there is not substantial evidence of such risk.  Evidence that Mary K. had had a foster care license and at some unspecified time had lost it, and that an application to be a

foster parent had been rejected (again at an unspecified time) because she did not release her medical records, did not mean that Mary K. presented a substantial risk of serious physical harm to A.C.  Further, at the time of the hearing in February 2012, Mary K. was willing to care for A.C., and did not indicate unwillingness until June 2012.[5]

As described above, Mother had arranged for care of A.C. at the time of the jurisdiction/disposition hearing, and so there was no basis for jurisdiction.  If this initial arrangement did not work out, Mother could easily have been located to make other arrangements.  It was error to find jurisdiction over A.C.

## DISPOSITION

The petition for extraordinary writ is granted.  The order sustaining the jurisdictional allegations and all subsequent orders are reversed and the case is remanded to the trial court.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


MALLANO, P. J.


ROTHSCHILD, J.

---

[5] Whether at this time A.C.'s best interests would be served by adoption is not relevant to whether jurisdiction was proper at the time of the hearing.  (*In re S.D.*, *supra*, 99 Cal.App.4th at p. 1083.)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| MAGGIE S., | B247306 |
| | (Los Angeles County |
| Petitioner, | Super. Ct. No. CK60010) |
| | |
| v. | CERTIFICATION AND |
| | ORDER FOR PUBLICATION |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| | |
| Respondent; | |
| | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| | |
| Real Parties in Interest. | |


The opinion in the above-entitled matter filed September 25, 2013, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.



MALLANO, P. J.          ROTHSCHILD, J.          JOHNSON, J.