Filed 4/25/23 In re R.C. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.C., a Person Coming Under the Juvenile Court Law. | B317429 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. B.C., Defendant and Appellant. | Los Angeles County Super. Ct. No. 20CCJP02267A |

APPEAL from orders of the Superior Court of Los Angeles County, Mary E. Kelly, Judge. Affirmed.

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

When father's daughter, R.C., was five weeks old, doctors discovered she had a fractured femur that had partially healed. Father speculated that the doctors or nurses had caused the injury while examining the child, but he acknowledged he may have handled her too roughly. The juvenile court took jurisdiction over the child and removed her from her parents' custody after finding the injury was of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent. On appeal, father contends the court erroneously presumed he or the child's mother had caused the injury. He also argues the court erred by removing the child from his custody because he was incarcerated. Finally, father contends the juvenile court and the Los Angeles County Department of Children and Family Services (Department) failed to comply with their duties of initial inquiry under state law (Welf. & Inst. Code, § 224 et seq.) implementing the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.).[1] We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Father B.C. and mother J.C. have one child together, R.C., who was born in March 2020. About five weeks later, Father took R.C. to a hospital emergency room because the child had momentarily turned blue and stopped breathing. A doctor wanted to perform further testing because the child had not been seen by a pediatrician since birth. Father

---

[1] Undesignated statutory references are to the Welfare and Institutions Code. Because ICWA uses the term "Indian," we do the same for consistency. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

initially insisted on taking R.C. home without scheduling a follow-up appointment.  He eventually agreed that the child could remain at the hospital overnight and doctors could perform a skeletal exam.  Father left the hospital, explaining he had " 'things to do.' "

Doctors performed a skeletal exam and took x-rays of the child.  Dr. Lori Taylor reviewed the x-rays and noted the "imaging findings suggest a healing nondisplaced fracture" of the left femur.  According to another doctor, Katharine Walz, the skeletal exam showed findings consistent with either a "healing fracture of [left] femur" or osteomyelitis, which is a bone infection.  The doctor, however, found no other signs of an infection.  Dr. Walz described the results as "concerning," and she referred the case to the Department.

A Department social worker visited R.C. in the hospital and found the child appeared to be healthy.  The social worker tried to interview father, but he refused to cooperate, threatened to file a lawsuit, and became hostile.  Security guards escorted father out of the hospital and handcuffed him.  The police arrested father for making threatening statements and gesturing as though he had a weapon.

During a subsequent interview with the social worker, father said he took R.C. to the emergency room because she had a runny nose, and he speculated that one of the nurses had caused the fracture.  Father said "[i]t was either me or the hospital" that caused the injury.  He acknowledged that he had been "kind of rough with [R.C.].  I don't mean no harm; like when I pick her up."  The social worker pointed out that the fracture had been healing by the time father took the child to the hospital, to which father responded, "It's going to fall back on me then. . . .

Maybe I was rough." Father clarified that, "[i]f I did it, it was accidentally."

Mother said she had asked father to take care of the child that night because she was tired and had a sore back; it was father's first night ever caring for R.C. Mother told father not to take R.C. to the hospital, because she thought it was normal for a baby to turn blue. Father, however, was nervous about R.C. because, according to mother, he did not have experience caring for a baby.

Mother denied causing the injury to R.C., and she claimed not to know how the child had suffered it. She speculated that a nurse could have caused the fracture at the emergency room. Later, mother said father told her a doctor had caused the fracture and she believed him.

Maternal grandmother told the Department that mother struggles with depression and had recently been diagnosed with bipolar disorder. She also suspected father had abused mother. According to maternal grandmother, mother had bruises while pregnant with R.C., and her explanations for the injuries did not make sense. Maternal grandmother did not believe mother would have harmed R.C.

Dr. Kelly Phong reviewed the hospital discharge summary and told the Department that R.C.'s fracture was " 'highly suspicious for non-accidental.' " The doctor noted the fracture would have been painful for the child. Dr. Phong suggested R.C. was not suffering from osteomyelitis because there were no other signs of an infection and osteomyelitis does not heal on its own.

R.C. underwent additional x-rays and a follow-up skeletal exam in June 2020. Dr. Catherine DeRidder reviewed the results and reported the fracture appeared to have healed completely.

Dr. DeRidder noted that the original skeletal survey taken at the hospital indicated the injury would have been between one and three weeks old at that time. She said the signs of healing to the bone were "very suspicious for physical abuse although birth trauma cannot be completely ruled out."

The Department filed a petition asserting R.C. is a child described by section 300, subdivisions (a) and (b). The petition alleged two general bases for jurisdiction: (1) R.C. had suffered a fractured femur; and (2) mother has a history of mental and emotional problems, which endangered the child's physical health and safety. As to the first basis, the Department indicated it intended to rely on the presumption found in section 355.1, which provides that "[w]here the court finds, based upon competent professional evidence, that an injury . . . sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (§ 355.1, subd. (a).)

The court detained R.C., and the Department placed her with a paternal relative. Mother described the relative caregiver as "pretty much" father's cousin, "[f]or the most part."

Father was in custody throughout the dependency proceedings, but it is not clear for what reason. In July 2020, a court sentenced him to six years in prison. At father's request, the court continued the jurisdiction hearing several times so he could appear at it.

The court finally held a combined jurisdiction and disposition hearing on December 20, 2021. Father urged

the court to dismiss him from the petition because the evidence showed he was trying to care for R.C. and would not have hurt her. He suggested a nurse could have caused the injury, or it could have occurred during birth. Father alternatively asked the court to place the child with him, with a plan that R.C. remain with the paternal relative caregiver while he was incarcerated.

R.C.'s counsel and the Department urged the court instead to sustain the petition and remove R.C. from both parents' custody. The Department argued that, even if the parents had met their burden of rebutting the section 355.1 presumption, they had not overcome the clear evidence showing they caused the injury.

The court sustained a single count under section 300, subdivision (a), related to R.C.'s fractured femur, and it dismissed the other counts. The court explained that it agreed with the Department's arguments with regards to R.C.'s injury, and it found the parents' speculation regarding the cause of the injury insufficient to rebut the presumption under section 355.1.

As to disposition, the court declared R.C. a dependent and removed her from her parents' custody, noting it relied on the same facts that supported jurisdiction. The court explained it was "concerned about the parents' ability to care for this child even at this time due to the parents' lack of candor and their engagement in minimization" regarding the femur injury.

Father timely appealed.

## DISCUSSION

### 1. *The court properly took jurisdiction over R.C.*

Father contends the juvenile court erred by taking jurisdiction over R.C. based on the presumption found in section 355.1. He contends the presumption did not apply

6

because there was competent professional evidence that neither he nor mother caused R.C.'s injury. Alternatively, he argues there is sufficient evidence to rebut the presumption.

Under section 355.1, where "the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (§ 355.1, subd. (a).)

The presumption "require[s] the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption." (Evid. Code, § 604; see *In re Quentin H.* (2014) 230 Cal.App.4th 608, 614–615 (*Quentin H.*).) "Once rebutted, the presumed fact may still be considered by the fact finder, as well as any reasonable inferences to be derived therefrom [citation], but without regard to the benefit of the presumption." (*Quentin H.*, at pp. 614–615.) A parent may rebut a presumption under section 355.1 by relying on information in the Department's own reports. (See *Quentin H.*, at p. 616; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1041.)

Here, father concedes there is substantial evidence that R.C. suffered a fractured femur. The only question, therefore, is whether there is sufficient competent professional evidence to

support the court's finding that the fracture is a type of injury ordinarily suffered as a result of a parent's unreasonable or neglectful acts. On that issue, Dr. Kelly Phong reviewed the hospital discharge summary and stated R.C.'s injury was " 'highly suspicious for non-accidental.' " Dr. Catherine DeRidder similarly remarked that, based on the skeletal survey, the fracture was "very suspicious for physical abuse." Based on this evidence—which father seems to concede is both professional and competent—the juvenile court reasonably could have found R.C.'s injury was of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts of her parents. The court, therefore, properly applied the presumption under section 355.1.

Father contends the presumption did not apply because there is equally competent professional evidence that R.C. suffered the injury during childbirth. In support, he points to Dr. DeRidder's remark that "birth trauma cannot be completely ruled out."

Although not stated explicitly, father is essentially arguing that a court may not apply a section 355.1 presumption if there is evidence in the record to rebut it. If that were the standard, in any case in which the presumption could be rebutted, it would be error to apply the presumption in the first instance. In effect, this would render a section 355.1 presumption conclusive. Section 355.1, however, creates a rebuttable presumption, not a conclusive one. (*Quentin H.*, *supra*, 230 Cal.App.4th at p. 610.) Father's argument, therefore, is not consistent with the statutory scheme.

Nor are we persuaded by father's contention that Dr. DeRidder's remark was sufficient to rebut the presumption.

8

In order to overcome a section 355.1 presumption, there must be evidence to "support a finding of its nonexistence." (Evid. Code, § 604.) Dr. DeRidder's speculative remark that she could not "completely rule[ ] out" the possibility that R.C. suffered the injury during childbirth is far from sufficient to support a finding that the injury was not the result of her parents' unreasonable or neglectful acts; at most, it would raise some doubt as to the issue. In any event, father overlooks that Dr. DeRidder's own report rules out the possibility that R.C. suffered the injury during childbirth. Specifically, Dr. DeRidder concluded R.C. sustained the injury no more than three weeks before the hospital performed the skeletal exam. R.C. was five weeks old when the hospital performed the exam, meaning she could not have sustained the injury during childbirth. On this record, Dr. DeRidder's passing remark about childbirth was not sufficient to rebut the section 355.1 presumption.

We also reject Father's argument that he rebutted the presumption by positing that he might have accidentally caused the injury while handling R.C. roughly. Even if that were true, handling a newborn in such a way as to cause a fractured femur undoubtedly constitutes an unreasonable or neglectful act. Moreover, it is irrelevant that father may not have intended to cause the injury, as section 355.1 does not require a purposeful intent.

2. ***The court did not erroneously remove R.C. from father's custody based on the fact he was incarcerated***

Father contends the juvenile court erred by relying on the fact that he was incarcerated to remove R.C. from his custody.

9

Father correctly states the mere fact a parent is incarcerated is insufficient to support dependency jurisdiction if the parent makes arrangements for the child's care and there is no risk to the child. (§ 300, subd. (g); *Maggie S. v. Superior Court* (2013) 220 Cal.App.4th 662, 672; see *In re S.D.* (2002) 99 Cal.App.4th 1068, 1077 [there is no " '[g]o to jail, lose your child' rule in California"].) Here, however, there is nothing in the record even to suggest the court removed R.C. from father's custody because he was incarcerated. Instead, the court explicitly stated it removed R.C. based on the same facts that supported jurisdiction—mainly R.C.'s fractured femur— and because it was "concerned about the parents' ability to care for this child even at this time due to the parents' lack of candor and their engagement in minimization" regarding the femur injury. Father does not challenge those bases for the court's dispositional orders. Accordingly, he has not shown the court erred in removing R.C. from his custody.

**3.     *Substantial evidence supports the court's ICWA findings***

Father contends the juvenile court's ICWA findings must be reversed because the Department failed to ask the relative caregiver and maternal grandparents whether R.C. is, or may be, an Indian child, as required under section 224.2, subdivision (b).

   a.     *Background*

At the detention hearing, the court noted that mother had submitted a Judicial Council form ICWA-020, Parental Notification of Indian Status (ICWA-020 form) indicating she has no Indian ancestry. Based on that form, the court found it had no reason to know or believe R.C. is an Indian child.

10

In July 2020, father filed an ICWA-020 form indicating he, too, has no reason to know R.C. is an Indian child. At a hearing the same month, the court appointed counsel to represent father and found he is R.C.'s presumed father. Based on father's ICWA-020 form, the court found no reason to know or believe R.C. is an Indian child through father's family. The court deferred making an ICWA finding with respect to mother. The court did not address its prior ICWA findings from the detention hearing.

According to the Department's reports, mother denied having Indian ancestry in July 2020, and father denied having Indian ancestry in September 2021. Mother told the Department she was raised by maternal grandparents, and she described her relationship with them as " 'perfect.' " Father said paternal grandmother passed away when he was eight years old, and he was subsequently raised by his sister, paternal aunt. Father did not have a good relationship with paternal grandfather, who passed away in 2013.

> b.      *Governing law and standard of review*

Congress enacted ICWA to curtail "the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement" (*Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32), and "to promote the stability and security of Indian tribes and families by establishing . . . standards that a state court . . . must follow before removing an Indian child from his or her family" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881; *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 998 (*Ezequiel G.*), review den. Nov. 22, 2022, S276223).

11

"California adopted conforming legislation in 2006 (Sen. Bill No. 678 (2005–2006 Reg. Sess.)), which was amended effective January 1, 2019 (Assem. Bill No. 3176 (2017–2018 Reg. Sess.)). As currently written, the law provides that the court and county welfare department have an affirmative and continuing duty to inquire whether a child for whom a petition may be filed is or may be an 'Indian child' (§ 224.2, subd. (a))— that is, an 'unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe' (25 U.S.C. § 1903(4); see § 224.1, subd. (a) [adopting federal definition])." (*Ezequiel G., supra*, 81 Cal.App.5th at p. 998.)

"The state law duty to make an ICWA inquiry 'begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child.' (§ 224.2, subd. (a).) If a child is removed from parental custody, the county welfare department 'has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' (§ 224.2, subd. (b).)" (*Ezequiel G., supra*, 81 Cal.App.5th at p. 998.)

"If the initial inquiry provides 'reason to believe' that an Indian child is involved in a proceeding—that is, if the court or social worker 'has information suggesting that either the parent of the child or the child is a member or may be eligible

12

for membership in an Indian tribe'—then the court or social worker 'shall make further inquiry' regarding the child's possible Indian status as soon as practicable. (§ 224.2, subd. (e).) Further inquiry 'includes, but is not limited to, all of the following: [¶] (A) Interviewing the parents, Indian custodian, and extended family members . . . . [¶] (B) Contacting the Bureau of Indian Affairs and the State Department of Social Services . . . . [and] [¶] (C) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.' (*Ibid*.)" (*Ezequiel G., supra*, 81 Cal.App.5th at p. 999.)

"If there is 'reason to know' a child is an Indian child, the agency shall provide notice to the relevant tribes and agencies in accordance with section 224.3, subdivision (a)(5). (§ 224.2, subd. (f).) There is 'reason to know' a child is an Indian child if any one of six statutory criteria is met—i.e., if the court is advised that the child 'is an Indian child,' the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe. (§ 224.2, subd. (d).)" (*Ezequiel G., supra*, 81 Cal.App.5th at p. 999.)

"If the juvenile court finds that 'proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child,' the court may make a finding that ICWA does not apply to the proceedings, 'subject to reversal based on sufficiency of the evidence.' (§ 224.2, subd. (i)(2).)" (*Ezequiel G., supra*, 81 Cal.App.5th at p. 999.)

c.    *Analysis*

As we understand his argument, father contends there is insufficient evidence to support the juvenile court's ICWA findings because the Department failed to conduct a proper and adequate inquiry of extended family members.  He argues the Department was statutorily mandated to interview all maternal and paternal relatives who were available during the course of the dependency proceeding—specifically, the relative caregiver and maternal grandparents—and the juvenile court was obligated to ensure those interviews occurred before it could find ICWA did not apply to the case.

At the outset, we do not agree with father that the Department had a statutory duty to interview the relative caregiver.  Mother described the caregiver as "pretty much" father's cousin, "[f]or the most part."  Assuming the caregiver is, in fact, father's cousin, she would be R.C.'s first cousin once removed.  First cousins once removed, however, are not considered extended family members for purposes of ICWA. (See 25 U.S.C. § 1903(2); § 224.1, subd. (c).)

Even if the caregiver were an extended family member, or the Department was required to interview her under some other provision, we would still affirm.  We considered a substantively similar argument in *Ezequiel G.*  The mother there argued the juvenile court erroneously relied upon the parents' declarations that "they did not have Indian ancestry as far as they knew" in finding ICWA did not apply, despite the availability of several identified extended family members whom the Department failed to ask about the child's possible Indian heritage.  (*Ezequiel G., supra*, 81 Cal.App.5th at pp. 997–998.)  Addressing the contention, we considered the initial duty to inquire of "extended

family members" under the plain text of our state's ICWA law (§ 224.2, subd. (b)) and how a juvenile court should understand that duty in assessing whether "proper and adequate further inquiry and due diligence" have been conducted (§ 224.2, subd. (i)(2)). (*Ezequiel G.*, at pp. 1004–1006.) Because "complying with the literal language of the statute—that is, making an *initial* and *further* ICWA inquiry of every member of a child's extended family, including first and second cousins, plus every other person who has an interest in the child—is absurd at best and impossible at worst," we determined a literal construction had to be discarded to avoid absurd results and to give effect to the manifest purposes of the statute. (*Id.* at pp. 1006, 1008–1009; see *Stokes v. Baker* (2019) 35 Cal.App.5th 946, 957.) Recognizing that "the question at the heart of the ICWA inquiry" is "[w]hether a child involved in a proceeding 'is or may be an Indian child,' " we held "the focus of the [juvenile] court's analysis should not be on the number of individuals interviewed, but on whether the [Department's] ICWA inquiry has yielded reliable information about a child's possible tribal affiliation." (*Ezequiel G.*, at p. 1009, quoting § 224.2, subd. (a).)

Applying that standard to the mother's contention in *Ezequiel G.*, we concluded the parents' denials of Indian ancestry were alone sufficient to find the Department's ICWA inquiry had yielded reliable information about the child's tribal affiliation. (*Ezequiel G., supra*, 81 Cal.App.5th at p. 1015.) In reaching this conclusion, we rejected "the suggestion made in some recent appellate decisions that a parent may not have reliable information about tribal membership." (*Id.* at p. 1011, citing *In re T.G.* (2020) 58 Cal.App.5th 275, 295.) As we explained, " 'ICWA does not apply simply based on a child or parent's Indian

15

ancestry' ' "; rather, "the 'definition of "Indian child" ' is 'based on the child's *political ties* to a federally recognized Indian Tribe, either by virtue of the child's own citizenship in the Tribe, or through a biological parent's citizenship and the child's eligibility for citizenship.' " (*Ezequiel G.*, at p. 1009, quoting U.S. Dept. of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016) p. 10 <https://www.bia. gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf> [as of July 29, 2022], archived at <https://perma.cc/5758-64CA> and Indian Child Welfare Act Proceedings, 81 Fed.Reg. 38778, 38795 (June 14, 2016) (BIA ICWA Proceedings), italics added.) We emphasized, " 'Tribal citizenship (aka Tribal membership) is voluntary and typically requires *an affirmative act* by the enrollee or her parent,' " such as " 'the filing of an application' " " 'for Tribal citizenship on behalf of the child.' " (*Ezequiel G.*, at pp. 1009–1010, quoting BIA ICWA Proceedings, 81 Fed.Reg. at p. 38783, italics added.)  Thus, because tribal membership typically requires an affirmative act, we held "a child's parents will, in many cases, be a reliable source for determining whether the child or parent may be a tribal member," and a juvenile court may therefore "find an ICWA inquiry was adequate even if an agency has not interviewed some available family members." (*Ezequiel G.*, at p. 1010.)

Applying the *Ezequiel G.* standard to the record in this case, we agree with the Department that the parents' repeated denials of Indian ancestry constituted sufficient evidence to support the juvenile court's finding that ICWA does not apply. As in *Ezequiel G.*, the evidence here shows mother had contact with maternal grandparents throughout her childhood and into her adult life.  In fact, mother described their relationship as

16

" 'perfect.' " Although father had a strained relationship with paternal grandfather and paternal grandmother died while he was a child, the record indicates he was raised by, and remained in contact with, his family. (Cf. *In re Y.W.* (2021) 70 Cal.App.5th 542, 548 [mother was adopted and did not have information about her biological relatives]; *In re A.C.* (2022) 75 Cal.App.5th 1009, 1015–1016 ["mother was the product of foster care and thus may not have known her cultural heritage"].) Nor does father explain why his cousin, the relative caregiver, might possess information relevant to R.C.'s Indian status that the child's own parents do not.

Under these circumstances, the possibility that mother or father might unknowingly be a member of a tribe is "trivially small." (*Ezequiel G., supra*, 81 Cal.App.5th at p. 1015.) And, critically, because the juvenile court could reasonably infer that the parents would know whether they took the sort of affirmative steps necessary to establish a political relationship to a tribe, the court also could reasonably find their denials of Indian heritage reliably established R.C. was not an Indian child within the meaning of ICWA. (See *id*. at pp. 1009–1010.) On this record, substantial evidence supports the juvenile court's ICWA finding.

Although we are affirming the juvenile court's findings and orders, we do not mean to suggest we are excusing the Department or the court from their affirmative and continuing duties of inquiry. (See § 224.2, subd. (a).) If the court receives new information providing reason to believe the child is an Indian child, it must reverse its initial ICWA determination and order the Department to conduct further inquiry. (§ 224.2, subd. (i)(2).)

17

## DISPOSITION

We affirm the juvenile court's jurisdictional findings and disposition orders.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

I concur:


EDMON, P. J.

**LAVIN, J., Concurring and Dissenting**:

I agree that the juvenile court properly took jurisdiction over the child. I also agree that the court did not err in removing the child from father's custody. For the reasons set forth in my dissent in *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1015–1025, however, I would reverse the court's findings under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related state law and remand for further proceedings. The Department of Children and Family Services could easily have asked the parents' extended family members about the child's possible Indian heritage and documented those efforts. It did not. Further, nothing in the record shows how those extended family members would have responded to questions about the child's possible Indian heritage.

LAVIN, J.