Filed 9/10/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re X.D., | B338140 |
| A Person Coming Under the Juvenile Court Law, | (Los Angeles County Super. Ct. No. 23LJJP00402A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| Gregory D., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Donald A. Buddle, Jr., Judge. Affirmed.

California Appellate Project, Jennifer Peabody, Acting Executive Director, and Nicole Kronberg, under appointment by the Court of Appeal, for Defendant and Appellant

Law Office of Amir Pichvai, Amir Pichvai for Plaintiff and Respondent.

\* \* \* \* \* \*

A juvenile court may exert dependency jurisdiction over a child if "the child's parent has been incarcerated . . . and cannot arrange for the care of the child." (Welf. & Inst. Code, § 300, subd. (g).)[1] Does this provision authorize jurisdiction where the two relatives an incarcerated parent suggests to a social services agency as potential caregivers are shown to be neither willing nor able to provide suitable care of the child while the parent is incarcerated? We hold that jurisdiction in this situation is appropriate because the parent's inability to arrange care may be inferred from the suggestion of relatives who are unable to provide suitable, reliable or appropriate care for the child. We accordingly affirm the juvenile court's exertion of dependency jurisdiction in this case.

---

1    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

# FACTS AND PROCEDURAL BACKGROUND

## I. Facts

### A. *The family*

Gregory D. (father) and N.F. (mother) have one child born in November 2014—X.D.[2]

In June 2015, father kidnapped mother and then-seven-month-old X.D., and held them against their will for two days. During that period, father punched, choked, and sexually assaulted mother; he also drove X.D. without a car seat or safety restraint. As a result of this conduct, the juvenile court exerted dependency jurisdiction over X.D. in a prior proceeding. The court ordered reunification services for father, but he showed no interest in reunification and did not avail himself of those services. The dependency court terminated jurisdiction in 2016 with an "exit order" granting mother full legal and physical custody of X.D. The order allowed father to have monitored visits with X.D. on a weekly basis, but father often went years without contacting X.D.

### B. *Mother's tragic death*

On December 4, 2023, mother and her new boyfriend got into an argument. The police were called. The fight escalated into physical violence when the boyfriend pushed mother to the floor and began to choke her. X.D., then nine years old, tried to intervene, but the boyfriend pushed her away. X.D. retrieved a knife from the kitchen and brought it to mother so mother could

---

[2]    Father has two other children by different mothers and mother had one other child by a different father; none of those children is at issue in this appeal.

3

defend herself. Law enforcement arrived, saw mother wielding a knife, and opened fire, killing mother.

At this time, father was in prison for violating his parole following a conviction for kidnapping and assaulting a different woman in 2018. Neither X.D. nor any surviving maternal relatives had spoken to father in years and were ostensibly unaware of his incarceration.

With mother deceased and father's whereabouts unknown, X.D. was placed with her maternal grandmother.

## II.    Procedural Background

### A.    *Petition*

On December 7, 2023, the Los Angeles County Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over X.D. on the basis that X.D. had "no parent to provide care, supervision, and the necessities of life" because mother was deceased and father's whereabouts were unknown, thereby endangering X.D.'s physical health and safety and warranting the exercise of dependency jurisdiction under subdivisions (b) and (g) of section 300.

### B.    *Father's whereabouts are ascertained, and father suggests two possible relatives to care for X.D. during his incarceration*

In January 2024, the Department tracked down father and learned he was serving a sentence at Pelican Bay State Prison, being held in solitary confinement. Although father had made no prior effort to reunify with X.D., had lost custody of X.D., and had not been in contact with X.D. for years, father now indicated that he wished to reunify with her upon his release from prison. In the meantime, father suggested that X.D. be placed with his

4

mother (paternal grandmother) or his brother (paternal uncle); although X.D. had a good relationship with maternal grandmother, father indicated that he wished X.D. to be removed from maternal grandmother's custody. X.D. had no interest in reunifying with father, expressing her belief that he was a "bad man" who does "crazy things," "hurts people when he drinks grown-up drinks," and "make[s] women"—including mother—"bleed"; X.D. stated she was not comfortable even *visiting* father unless she had a "bodyguard" or "someone with 'special powers' to keep her safe." X.D. also did not know any of the paternal relatives, and had no interest in residing with them.

Father did not reach out to the two paternal relatives he suggested as potential caregivers for X.D., but the Department did. The Department visited paternal grandmother, and found that she lived in a two-bedroom apartment with her two adult children, one of whom had just been released from a year-long incarceration (which precluded X.D.'s placement absent a further investigation); paternal grandmother appeared to be bedridden; the house was "very cluttered" with sundry items including furniture and appliances, and was littered with food and other detritus in the living room and paternal grandmother's bedroom. The Department made several attempts to contact paternal uncle, but he did not return the calls—even after the Department spoke with his girlfriend, who reported that they were already caring for two children under the age of one.

C. *Jurisdiction and disposition*

The juvenile court held the combined jurisdiction and disposition hearing over two days on March 14 and April 22, 2024. The court acknowledged that father's whereabouts were now known, but inferred that father was unable to arrange for

5

X.D.'s care because the two "paternal relatives" father had suggested were "unable to care for" X.D., and because father himself had "insignificant involvement" in X.D.'s life and had "in the past [failed] to express interest in reunifying or providing for" X.D.  The court interlineated the petition to replace the allegations that father's whereabouts were unknown with the allegations that father was "incarcerated [and] unable to arrange care," and sustained the interlineated allegations under subdivisions (b) and (g) of section 300.  The juvenile court then removed X.D. from father and ordered reunification services for father.

**D.** *Appeal*

Father timely appealed.

## DISCUSSION

Father argues that insufficient evidence supports the juvenile court's jurisdictional findings under subdivisions (b) and (g) of section 300.  Because a single allegation is sufficient to sustain dependency jurisdiction (*In re D.P.* (2023) 14 Cal.5th 266, 283-284), we focus on whether the court's finding under subdivision (g) of section 300 is supported by substantial evidence.  (*In re R.M.* (2024) 99 Cal.App.5th 240, 246 (*R.M.*); see *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).)  In undertaking this inquiry, we view the evidence in the record in the light most favorable to the juvenile court's findings, resolving any factual disputes and reasonable inferences in favor of the court's exercise of jurisdiction.  (*I.J.*, at p. 773; *In re I.C.* (2018) 4 Cal.5th 869, 892.)

As pertinent here, subdivision (g) of section 300 empowers a juvenile court to exert dependency jurisdiction over a child if

"the child's parent has been incarcerated . . . and cannot arrange for the care of the child."  (§ 300, subd. (g).)[3]

Consistent with the statute's plain language (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 673), a parent "cannot arrange" for a child's care if the parent (1) "is physically or mentally incapable of making" arrangements for the child's care (*In re Aaron S.* (1991) 228 Cal.App.3d 202, 208 (*Aaron S.*)), or (2) is otherwise "unable to arrange for [the child's] care" (*id.* at p. 212; *In re S.D.* (2002) 99 Cal.App.4th 1068, 1077, 1079 (*S.D.*); *In re Athena P.* (2002) 103 Cal.App.4th 617, 630).  What matters is whether the incarcerated parent is incapable or unable to arrange for the child's care *by the time of the jurisdictional hearing*; whether the parent arranged for the child's care in advance of their incarceration is irrelevant.  (*Aaron S.*, at p. 208; *R.M.*, *supra*, 99 Cal.App.5th at pp. 247, 250; *In re Monica C.* (1994) 31 Cal.App.4th 296, 305 (*Monica C.*).)  A parent's incapacity or inability to arrange care may be inferred from the parent's failure to arrange care by the time of the jurisdictional hearing (*Athena P.*, at pp. 629-630 [court may "conclude" parent's

---

[3]     Subdivision (g) authorizes the exertion of dependency jurisdiction on several other grounds as well—namely, (1) when "[t]he child has been left without any provision for support," (2) when "physical custody of the child has been voluntarily surrendered pursuant to Section 1255.7 of the Health and Safety Code and the child has not been reclaimed within the 14-day period specified in subdivision (g) of that section," and (3) when "a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful." (§ 300, subd. (g).)

7

inability from past failure to arrange care]; accord, *In re E.A.* (2018) 24 Cal.App.5th 648, 663 (*E.A.*) ["evidence of a past inability to provide care or support is probative of [a parent's] current ability"]) or from the parent's failure to be involved or otherwise interested in the child's life (*In re James C.* (2002) 104 Cal.App.4th 470, 484 ["[t]he absence of evidence suggesting that the father was ever interested in the welfare of the two toddler children during the entire time of his incarceration was sufficient for the juvenile court to infer that he either could not or was incapable of making preparations for their care"], superseded by statute on other grounds as stated in *In re Christopher C.* (2010) 182 Cal.App.4th 73, 82-83; cf. *In re M.R.* (2017) 7 Cal.App.5th 886, 897).  Critically, the type of care that the parent must be incapable or unable to arrange must be care that is "suitable," "reliable" or "appropriate" for the child during the period of the parent's incarceration (rather than for the child's long-term placement).  (*Aaron S.*, at p. 212 ["suitable"]; *Monica C.*, at p. 308 [same]; *R.M.*, at p. 249, fn. 5 ["reliable"]; *id.*, at p. 250 ["appropriate"]; cf. *R.M.*, at p. 250 ["advance plan" unnecessary]; *S.D.*, at pp. 1077-1078 [same].)  Consistent with the general burden of proof (§ 355), the Department bears the burden of proving, by a preponderance of the evidence, that the parent is incapable of or unable to arrange care (*M.R.*, at p. 897; *S.D.*, at p. 1078).

Substantial evidence supports the juvenile court's finding that father was unable to arrange for suitable, reliable, or appropriate care for X.D. during the period of his incarceration.[4] Setting aside that father himself took no affirmative action to

---

[4]    The fact of father's incarceration, as required by section 300, subdivision (g), is undisputed.

8

arrange for X.D.'s care after learning of mother's death (and hence X.D.'s need for care), substantial evidence supports the court's finding that the two relatives father proposed to the Department would not provide suitable, reliable, or appropriate care for X.D. during father's incarceration: Paternal grandmother appeared to be bedridden and lived in a "cluttered," unkempt residence with two other people—one of whom had a criminal record that, at a minimum, would need special clearance before placement of X.D. was permitted (§ 361.4; Health & Saf. Code, § 1522, subd. (g)); paternal uncle expressed his utter disinterest by failing to respond to the Department's many efforts to contact him. Further, father had expressed zero interest or involvement in X.D.'s life for years, as he had made no effort to reunify with her in the prior dependency case and almost never visited her, having last seen her three years prior to mother's death. The juvenile court could reasonably infer from father's inability to name a suitable caretaker as well as his disinterest in X.D.'s life that he was unable to arrange for her care.

Father resists this conclusion with three arguments.

First, he argues that dependency jurisdiction under subdivision (g) of section 300 may not be exercised as long as a parent is physically and mentally capable of naming *anyone* as a potential caregiver—even if the parent has otherwise taken no interest in the child's life and even if the record shows that suitable, reliable, and appropriate care would not be provided by that caregiver.

To be sure, some cases contain sweeping language purporting to hold that jurisdiction under subdivision (g) is appropriate only when a parent is "*incapable* of arranging for the provision of care" and purporting to indicate that the "suitability"

9

of a potential caretaker is irrelevant.  (*R.M.*, *supra*, 99 Cal.App.5th at pp. 248, 250, italics added and omitted; *Maggie S. v. Superior Court* (2013) 220 Cal.App.4th 662, 673; *Monica C.*, *supra*, 31 Cal.App.4th at p. 305.)  But those cases as well as others also contain additional language qualifying and delimiting such sweeping verbiage and, more to the point, every case which has held dependency jurisdiction under subdivision (g) was unfounded arose where the parent had named a caregiver who would provide suitable, reliable, and appropriate care.  (*Aaron S.*, *supra*, 228 Cal.App.3d at pp. 209-210 [proffered relative had taken child into her home]; *S.D.*, *supra*, 99 Cal.App.4th at p. 1071 [two relatives willing to assume care of child]; *R.M.*, at pp. 243-244, 249 [proffered relatives willing and able to care for child, and eventually assumed custody of them]; *In re Andrew S.* (2016) 2 Cal.App.5th 536, 542-543 [proffered caregiver able to meet the children's needs]; *Maggie S.*, at pp. 665, 672-673 [proffered caregiver willing and able to care for child]; see generally *Kaiser Foundation Hospitals v. Workers' Comp. Appeals Bd.* (1985) 39 Cal.3d 57, 63, fn. 5 [the "holding" of a case cannot be "divorced from [its] facts"].)

What is more, the construction father urges—namely, that dependency jurisdiction under subdivision (g) is not established as long as the incarcerated parent can name *anyone* as a possible caregiver—would mean that a juvenile court could not exert dependency jurisdiction over a child whose parents are incarcerated and whose proffered caregiver might be dangerous, disinterested, or, for that matter, dead.  Depriving a juvenile court of the ability to exert jurisdiction and provide the necessary oversight and services that jurisdiction authorizes in order to safeguard a child violates a fundamental "purpose" of dependency

10

law: "to ensure the safety, protection, and physical and emotional well-being of children who are at risk of . . . harm." (§ 300.2, subd. (a); see also § 362, subd. (a) [exercise of jurisdiction allows juvenile court to "make any and all reasonable orders" for "care . . . and support of the child"].) For this reason, we disagree with the suggestion in *S.D.*, *supra*, 99 Cal.App.4th at p. 1079, that a parent must always be given multiple opportunities to name possible caregivers if earlier proffered caregivers are unsuitable; depriving a court of the ability to exert jurisdiction while a parent goes through a laundry list of relatives and friends would place a child in limbo while their parent is incarcerated and no suitable caregiver is available.

Second, father argues that substantial evidence does *not* support the juvenile court's finding that he was unable to arrange suitable care. Father asserts that no finding regarding the paternal grandmother's suitability could be made unless and until the Department had "follow-up conversations with paternal grandmother" about its concerns and "worked with paternal grandmother" to address those concerns. However, the record indicates that the Department spoke with paternal grandmother several times and made a home visit; the concerns uncovered during those contacts are substantial evidence of her unsuitability. Nothing in subdivision (g) of section 300 obligates the Department to make efforts to *reform* an unsuitable relative before the court may exert dependency jurisdiction. Father also asserts that we may not infer his inability to arrange suitable care from his disinterest because some facts in the record indicate that he was not *totally* disinterested—namely, he had expressed an interest in reunification and had complete three minutes-long phone calls with X.D. "without issue." These countervailing facts

11

do not preclude the many prior years of utter disinterest from constituting substantial evidence.

Third, father argues that he *was* capable of arranging for X.D.'s care because he "did not block maternal grandmother from caring for" X.D. While X.D. was appropriately cared for by maternal grandmother, it was the Department—not *father*—who arranged for that placement. Father does not get credit for it (*E.A.*, *supra*, 24 Cal.App.5th at p. 662), particularly when father has indicated that he wishes to remove X.D. from maternal grandmother's custody in favor of one of *his* relatives despite X.D.'s statements that she does not know any of father's relatives and is frightened of father.

## DISPOSITION

The jurisdictional order is affirmed.

**<u>CERTIFIED FOR PUBLICATION</u>**.


_____, P.J.
HOFFSTADT


We concur:


_____, J.
MOOR


_____, J.
KIM (D.)


12